**Myrna B. LAMB**

v.

**Talbout RANTOUL, Donald M. Lay and Rhode Island School of Design.**

Civ. A. No. 75–0008.

United States District Court,
D. Rhode Island.

Dec. 3, 1981.

Harold H. Winsten, Richard D. Boriskin, Providence, R. I., for plaintiff.

Peter J. McGinn, William R. Grimm, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

In this action the plaintiff seeks damages for alleged discriminatory practices of the defendants in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e–2, and the Equal Pay Act, 29 U.S.C. § 206(d). Jurisdiction is premised on 28 U.S.C. 1343(a)(3), (4) and 29 U.S.C. 216(b).

The plaintiff received her Bachelor's Degree in Fine Arts (B.F.A.) and Master's Degree in Art Teaching (M.A.T.) from the defendant, Rhode Island School of Design (RISD), and also studied in Italy in a European Honors Program. She started teaching as a faculty member of RISD in 1967[1] and continued to do so throughout the period pertinent to this litigation. The Title VII and Equal Pay Act claims will be discussed separately.

*Equal Pay Act Claims*

1. Employment Prior to July 1, 1972

The plaintiff alleges that RISD violated the Equal Pay Act in her case during the academic years 1969–70 and 1970–71 and during the RISD summer sessions of 1970. Her claim under the Equal Pay Act is based primarily on a comparison of her qualifications and salary during these periods with those of a male RISD faculty member, Brian Pelletier. Juxtaposing the two I find as follows:

| TIME | LAMB | SALARY AND FACULTY POSITION PELLETIER |
|---|---|---|
| Summer 1969 | $800 – instructor | $850 – instructor |
| 1969–70 year | $7000 and benefits instructor in Freshman Foundation[2] | $8500 and benefits instructor in Freshman Foundation |

1. I start with this year although there was some employment in 1966 while she was a student.

2. Freshman Foundation is a program which teaches figure drawing, two and three dimensional design, nature drawing, and certain other subjects to first year students at RISD.

| TIME | LAMB | SALARY AND FACULTY POSITION PELLETIER |
|---|---|---|
| Summer 1970 | $800 – instructor | $850 – instructor |
| 1970–71 | $8000 and benefits instructor in Freshman Foundation | $9500 and benefits instructor in Freshman Foundation |
| Summer 1971 | $1800 – Pre-College Instructor | ———————— |
| Summer 1972 | $2000 – Pre-College Instructor | ———————— |

Mr. Pelletier's educational background can be summarized as follows: Bachelor of Science degree awarded by Southeastern Massachusetts Technical Institute in 1964; Master's degree in Fine Arts (M.F.A.) in Art Education, awarded by RISD in 1966; and M.F.A. in Photography awarded by RISD in 1967.

Even if the foregoing comparison proves sex discrimination in salary, a determination that I need not make, no cause of action exists. The plaintiff's Equal Pay Act claim is grounded upon section 6 of the Act, 29 U.S.C. § 206(d)(1), which reads as follows:

(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex; *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

Before Ms. Lamb can claim protection under this provision, she must be an employee not excluded from § 206(d)(1) by 29 U.S.C. § 213(a)(1). § 213 provides:

(a) The provisions of sections 6 (*except section 6(d) in the case of paragraph (1) of this subsection*) and 7 [29 U.S.C. §§ 206, 207] shall not apply with respect to—

(1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of the Administrative Procedure Act except ... [that] an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the work-week are devoted to such activities.... (emphasis added).

*Id.* § 213(a)(1).

Prior to July 1, 1972, the parenthetical phrase "except section 6(d) in the case of paragraph (1) of this subsection" was *not* part of 29 U.S.C. § 213(a)(1). That phrase was added by an Act of Congress on June 23, 1972, 86 Stat. 375 (1972), *reprinted in*

[1972] U.S.Code Cong. & Ad.News 447. Thus, prior to July 1, 1972, no "executive, administrative, or professional" employees were protected by the Equal Pay Act. Simply put, if Ms. Lamb as an Instructor was a "professional" under the unamended Equal Pay Act, then she cannot prevail on her claims for RISD periods of employment that occurred prior to July 1, 1972. *See* 29 C.F.R. § 541.5(b) (1980).

Pursuant to 29 U.S.C. § 213(a)(1), the Secretary of Labor has promulgated regulations defining the term "professional" under the Equal Pay Act. Under the pertinent regulation, virtually unchanged since at least 1958, an "employee employed in a bona fide professional capacity "under the Equal Pay Act includes any employee whose primary duty consists of the performance of

> work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes.

29 C.F.R. § 541.3(a)(1) (1980); 29 C.F.R. § 541.3(a)(1) (1958). *See Craig v. Far West Engineering Co.*, 265 F.2d 251, 256 n.6 (9th Cir.), *cert. denied*, 361 U.S. 816, 80 S.Ct. 57, 4 L.Ed.2d 63 (1959). The parties in this case, however, disagree as to whether the plaintiff was a "professional" when employed as a RISD Instructor during the periods of time in question.

The Court must now determine whether the plaintiff was indeed employed in a "bona fide professional capacity" within the meaning of this regulation. The record is replete with references to the plaintiff's advanced training and knowledge in art and art education. Such training and knowledge were gained through a prolonged course of "specialized intellectual instruction and study" at RISD, including study in Italy in a European Honors Program. *See* 29 C.F.R. § 541.3(a)(1). Her primary duty during the relevant periods was college-lev-

el art instruction—a field of instruction "requiring knowledge of an advance type". *Id.*

The plaintiff argues that the 1966 Amendment to 29 U.S.C. § 213(a)(1), which added the parenthetical phrase "including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools" after the term "professional capacity," represents a legislative intent to exclude *college-level* educators from the statutory exemption for professionals. In other words, the plaintiff is arguing that *elementary* and *secondary* school teachers are "professionals" (and therefore excluded from the Equal Pay Act prior to July 1, 1972), but that *college* teachers are not "professionals" (and therefore protected by the Equal Pay Act prior to July 1, 1972).

This argument is neither appealing nor pragmatic. The legislative history of the 1966 Amendment does not support the argument, discussing only the exclusion of elementary and secondary school teachers from the protection of the Equal Pay Act. *See* S.Rep.No. 1487, 89th Cong., 2d Sess., *reprinted in*, [1966] U.S.Code Cong. & Ad. News 3002, 3010. Furthermore, the term "including" at the beginning of the parenthetical phrase is ordinarily an expansive term, not a term of limitation. In short, neither legislative history nor case law supports the plaintiff's interpretation.

■ Clearly, therefore, during the periods of employment in question, the plaintiff was employed in a "bona fide professional capacity" within the meaning of 29 C.F.R. § 541.3(a)(1) (1980), and was not covered by the provisions of the Equal Pay Act prior to July 1, 1972. 29 U.S.C. § 213(a). Accordingly, there were no actionable violations of that statute by the defendants during the academic years 1969–70 and 1970–71, and during the Summers of 1970 and 1971.

2. Employment After July 1, 1972

■ The 1972 amendment to 29 U.S.C. § 213(a) extended coverage to professionals as of July 1, 1972. Assuming, *arguendo* that this amendment was effective in time

to cover Ms. Lamb's Summer 1972 employment, she has still failed to establish a prima facie case of a violation of 29 U.S.C. § 206(d) by the defendants. In order to make out a prima facie case, the plaintiff must show that RISD paid higher wages to male employees for equal work on jobs requiring equal skill, effort, and responsibility under similar working conditions during the Summer of 1972. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). Plaintiff, however, has failed to do so. Mr. Pelletier was not employed by RISD during the 1972 Summer, and the plaintiff produced no evidence showing that she was paid less than any male faculty member (or male faculty members in general) that summer. In fact, Mr. Timothy Casey, a male RISD faculty member during the Summer of 1972, was paid exactly half of the salary that Ms. Lamb was paid that summer. Thus, as to all of the periods of employment for which plaintiff has alleged violations of the Equal Pay Act, judgment must be entered for the defendants.

### Title VII—42 U.S.C. § 2000e–2 Allegations

In September of 1967, the plaintiff was hired on a part-time basis to teach a foundation drawing course during the first semester of 1967–68. This employment continued through the Spring of 1969. Separate contracts were executed for each of these periods.

In the spring of 1969, the plaintiff discussed her future employment with the then Dean, Hershey, who offered her only two one-year contracts. He explained that the school was dangerously inbred with RISD graduates, and that there had to be an anti-inbred policy restricting future employment of such graduates. Thus, he stated that she, a RISD graduate, would not be rehired after completing her second one-year contract. Knowing this, Ms. Lamb accepted these contracts.

In 1969, the defendant Rantoul became President of RISD. He was disturbed by the number of RISD graduates on the faculty and stressed to division chairmen that RISD's hiring practices had to change. He set in motion an unwritten policy that RISD graduates could be hired to fill short-term, temporary positions in order to acquire some work experience, but not for permanent faculty positions until they had some outside experience. Such experience might include a degree from another college, working on the outside in a profession such as painting or architecture, or teaching at another university. There were exceptions to this policy not pertinent to this case. Mr. Rantoul felt that this policy would diversify the RISD faculty by getting new views and ideas from the outside.

This new policy, however, was not applied retroactively to faculty members already employed by RISD in permanent positions who had no notice of the policy. As a result, approximately twenty-four faculty members who held RISD degrees (two of whom were women) and whose employments dated variously from 1923 to 1968 (when Brian Pelletier was hired), were exempted from this policy. Thus, Mr. Pelletier, who was hired in 1968, had no notice of the anti-inbred policy and was further exempted from the policy because he also held a degree from an outside university.

Although Rantoul's policy was never put in writing, it is clear that it was applied to at least one other teaching faculty member, Timothy Casey. Moreover, it may also have been applied to another teacher, John Williams.

As exemplified by the anti-inbred policy, there were neither uniform nor written standards by which full-time RISD faculty members were hired (at least not until after the Equal Employment Opportunities Act was passed in 1972). Prior to the passage of this Act, hiring decisions were largely made by department heads with approval required by the Deans' Advisory Committee and by the President. This practice, however, changed abruptly in 1972.

In December 1972, a RISD Equal Employment Officer was designated. Other hiring changes included mandatory use of a search committee to screen and recommend all faculty candidates beginning with the

hirings for the 1973 Spring Semester. Another change required that all vacancies be advertised. A written affirmative action plan was formulated and adopted by the 1973 Fall Semester. Its goal was to increase the number of women and minorities on the RISD faculty. The plan required, *inter alia*, a formal application for each candidate who wished to be considered for a vacancy. This particular practice was required for all full-time faculty positions to be filled after the 1972 Fall Semester and pre-dated the formal affirmative action plan.

Against this background, the Court will now focus on the specific allegations made by this plaintiff, who filed her discrimination complaint with the Rhode Island Human Rights Commission on November 28, 1972. She received her EEOC "Notice of Right to Sue Within 90 Days" on or about November 11, 1974. The case was filed in this Court on January 15, 1975.

The plaintiff's Title VII allegations involve three separate claims of sex discrimination: 1) RISD paid her a salary not commensurate with the salaries paid to male faculty members; 2) RISD refused to renew her employment in 1971 and again in 1972 during the regular school year, and refused to appoint her as a full-time faculty member; and 3) RISD has refused to consider her for temporary teaching positions from 1972 to the present.

As a point of departure, the Court notes that Title VII was not applicable to RISD until Congress eliminated the Title VII exemption for educational institutions found in 42 U.S.C. § 2000e–1 prior to 1972. Furthermore, the statute cannot be applied retroactively. *Weise v. Syracuse University*, 522 F.2d 397, 410–11 (2nd Cir. 1975). However, the plaintiff argues that evidence of prior discriminatory acts is admissible at trial to show patterns and practices of the defendants in violation of Title VII which have continued after the effective date. Prior discriminatory acts and statistical evidence, she contends, may be considered as an aid in determining discriminatory motive.

Thus, the questions to be answered are: a) were there prior discriminatory practices; and, if yes b) to what extent can prior discriminatory practices be considered in relation to the alleged grievances at issue? As to the first question, in *Hazelwood School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the Supreme Court stated that "[p]roof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decision-making process had undergone little change." *Id.* at 309 n.15, 97 S.Ct. at 2742 n.15. Such is not the case here. As already discussed, the decision-making process at RISD was changed significantly by adoption of an anti-inbred policy and an affirmative action program. Prior practices may have been male-oriented, and it may be that Ms. Lamb was treated unfairly, but I see no carry-over of such attitudes past 1972. Ms. Lamb has failed to meet her burden of persuasion on this issue.

### Discrimination in Salaries

Ms. Lamb's Title VII salary claim (like all her Title VII claims) is limited to appointments during and after 1972. Ms. Lamb was employed by RISD in the pre-college summer sessions of 1972, 1973, 1974 and 1975 at a salary of $2000 for the 1972 summer, and at salaries of $2500 for each of the remaining three summers. These jobs and a part-time position in the Fall of '72 in the Division of Fine Arts at RISD are the only positions relevant to the Title VII salary claims.

With regard to all of these positions and salaries, the plaintiff has produced no evidence showing that she was paid less than male faculty members in comparable positions. The plaintiff has offered no evidence indicating that she was paid less than any particular male faculty member, or less than male faculty members in general. In fact, during the 1972 Fall Semester she was paid $400 *more* than Mr. Casey. During the summers of 1973, 1974 and 1975, her salary

was the highest possible under RISD's faculty summer salary structure according to the uncontroverted evidence produced at trial. On these facts, the plaintiff has failed to establish even her initial prima facie case of sex discrimination based on unequal salary under Title VII.

### Discrimination in Hiring

■ To prove her argument that RISD's failure to appoint her to permanent or temporary positions was sexually motivated, the plaintiff points to the employment of the following individuals: Brian Pelletier, Tim Casey, Irving Hames, Victor Johnson, and James Carpenter. However, such comparisons do not support plaintiff's claims of sex discrimination. First, it is undisputed that the plaintiff was told of the anti-inbred policy, and I find that she knew that she would not be re-hired after completing her second one-year contract because of this policy. Second, as to Mr. Casey, I find the following. RISD hired Ms. Lamb to teach for the 1972 Fall Semester on an emergency basis about a week before the Semester began at a salary of $1500. She asked about a 1973 Spring Semester position teaching advanced drawing, but was told that the position was filled by Mr. Casey and that, in any event, she was not qualified for the position. There is no evidence of discrimination here. Mr. Casey had been hired for that position in June 1972. Plaintiff had expressed no interest in that position prior to the Fall of 1972. Furthermore, Mr. Casey was also hired to teach during the 1972 Fall Semester at the same time Ms. Lamb had been hired, but received a salary of $1100, less than the plaintiff's $1500. Finally, I do not find persuasive the plaintiff's arguments as to why there is no merit to the defendants' finding Mr. Casey more qualified. Although this Court is mindful of the difficulties in proving sex discrimination in academia, I nonetheless find the explanation offered by the defendants worthy of credence. The administration was sincerely trying to turn the school around. I believe that the defendants felt that Ms. Lamb was not qualified to teach the course given to Mr. Casey as it related to the entire drawing program. The anti-inbred policy was vital to the continued development of RISD, and, because of this, Mr. Casey was offered a maximum of two years at RISD, just as was Ms. Lamb.

Other evidence in the case also controverts plaintiff's allegations. In November, 1972, the plaintiff was told by President Rantoul that there were no RISD faculty openings available for the 1973–74 academic year and that, even if there were, she could not be considered because of the anti-inbred policy. As it turned out, two new faculty positions in Ms. Lamb's field became available for the 1973–74 year, and these positions were filled by a woman (Lorraine Shemish) and a minority male (Victor Johnson) through the newly-instituted search committee/affirmative action procedure. Since her November, 1972 meeting with defendant Rantoul, Ms. Lamb has not applied for any non-summer faculty positions at RISD.

In addition to the hirings of Messrs. Pelletier, Casey, and Johnson, Ms. Lamb has objected to the RISD faculty hirings of Irving Haynes, William Newkirk, and James Carpenter during the academic years including and following 1973–74. All were hired within Ms. Lamb's discipline. Mr. Johnson is not a RISD graduate and holds fine arts degrees from Yale and the University of Texas. Mr. Haynes holds two RISD degrees, and had approximately twenty years of outside professional experience prior to being hired in 1973. He was hired as an Instructor for the 1975–76 academic year without going through the search committee/affirmative action process. Mr. Newkirk was hired for the 1975–76 school year through the search committee/affirmative action procedure. He also held a RISD degree, but had several years of outside professional experience in graphic design. Mr. Carpenter, also a RISD graduate, was hired for the 1973–74 academic year through the search committee/affirmative action process. He had teaching experience at five colleges prior to coming to RISD and had outside professional experience as well.

The plaintiff continued to be employed by RISD in the pre-college Summer Program

for the summers of 1973, 1974, and 1975 after she filed her complaint. She inquired during the spring of 1976 about summer employment for the 1976 Summer pre-college session. RISD determined, however, that she should not be hired for that summer. Ms. Lamb has not specifically applied for any summer positions since that time.

■ The decision not to renew Ms. Lamb's second one-year contract, which covered the 1970–71 academic year, and not to appoint her to the permanent RISD faculty, was made in 1969 and took effect when she was not rehired for the 1971–72 academic year. Because made prior to the 1972 amendments to Title VII, this decision is not actionable even if it were made in a discriminatory manner. *Weise, supra,* at 410–11. *See also Hazelwood School District v. United States,* 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977). Although this decision was made prior to the March 24, 1972 effective date of 42 U.S.C. § 2000e–2, however, it is not irrelevant to post-effective date hiring decisions affecting Ms. Lamb. *Hazelwood, supra,* at 309 n.15, 97 S.Ct. at 2742 n.15. This is particularly true because RISD hired Ms. Lamb on an emergency basis for the 1972 Fall Semester (in spite of its earlier statements), *again* citing the 1969 anti-inbred decision in her case as the reason why she would not be rehired to the regular faculty on a temporary or permanent basis after the 1972 Fall Semester until she acquired outside experience.

The plaintiff also introduced statistical evidence showing that women constituted a small minority of the RISD faculty in general, and also of the departments in which she worked in particular. This evidence concerned the faculty's composition from 1972 and thereafter. Statistics of this nature may be helpful in supporting an inference of unlawful sex discrimination against an individual employee. *Davis v. Califano,* 613 F.2d 957, 962 (D.C.Cir.1980).

The standard for establishing a violation of Title VII in sex discrimination cases is set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207, 25 F.Emp.Prac.Cas. 113 (1981), and *Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106 (1st Cir. 1979). Under this standard, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of unlawful sex discrimination. *McDonnell, supra,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department, supra,* 450 U.S. at 253, 101 S.Ct. at 1094, 25 F.Emp.Prac.Cas. at 115. To establish this initial prima facie case, the plaintiff must show that:

(1) she is a member of a protected class;

(2) she applied for and was qualified for a position for which RISD was seeking applicants;

(3) despite her qualifications, she was rejected; and

(4) thereafter the position remained open and RISD continued to seek applicants with the plaintiff's qualifications.

*McDonnell, supra,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department, supra,* 450 U.S. at 253, 101 S.Ct. at 1094, 25 F.Emp.Prac. Cas. at 115, 115 n.6.

The Court must now apply this initial standard to the evidence. With regard to the hiring of Mr. Casey for the 1973 Spring Semester, Ms. Lamb has not established an initial prima facie case. The uncontroverted evidence shows that Mr. Casey was hired for this position long before the plaintiff was hired for the 1972 Fall Semester, and long before she ever knew of (or expressed interest in) the 1973 Spring position. Having failed to apply for this specific position in a timely manner, it cannot be inferred that the plaintiff was discriminated against in its being filled.

As to other post-March 24, 1972 faculty hirings and RISD's reaffirmed decision in November 1972 not to appoint Ms. Lamb to the permanent faculty, however, there *is* sufficient evidence to support a finding that the plaintiff met her initial burden of establishing a presumption of sex discrimination

by RISD in its hiring decisions towards her after November, 1972. As a woman, Ms. Lamb is clearly a member of a class protected under Title VII. With regard to the other prima facie elements set forth in *McDonnell* and *Texas Department*, a somewhat more complicated analysis is required. This is because Ms. Lamb never formally applied for the specific positions filled by Messrs. Johnson, Newkirk, Carpenter, and Haynes, positions for which she was clearly qualified.

*McDonnell* and *Texas Department* seem, at first glance, to require that a plaintiff apply for a specific position or appointment when attempting to establish the initial presumption. However, *McDonnell* itself stresses that the prima facie elements required may vary depending upon different factual situations. *McDonnell, supra*, 411 U.S. at 802 n.13, 93 S.Ct. at 1824 n.13. The method of meeting the initial burden was never intended to be rigid, mechanized, or ritualistic. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Davis v. Califano, supra*, at 961. Furthermore, the law will not require a futile act. *See, e.g., Halprin v. Babbitt*, 303 F.2d 138, 141 (1st Cir. 1962). After her November, 1972 conversation with President Rantoul, it is understandable that Ms. Lamb never applied for specific positions at RISD, whether advertised or not. Under the facts of this case, Ms. Lamb should not be required to establish that she formally applied for a permanent faculty position after March 24, 1972, or that she formally applied for specific positions on the RISD faculty. There is no question that males were hired for positions that Ms. Lamb was qualified to fill after November, 1972. Finally, the statistical evidence helps create the initial inference of sex discrimination in these hirings. *Davis v. Califano, supra*, at 962.

█ Because plaintiff has established an initial presumption of unlawful discrimination in RISD's failure to appoint the plaintiff to the permanent faculty, or to hire her for specific post-Fall 1972 positions, the defendant is required to "articulate" a legiti-

mate nondiscriminatory reason for its adverse action regarding the plaintiff. This burden is merely "a burden of production" to articulate or state a valid reason. The burden of persuasion, however, remains at all times on the plaintiff. *McDonnell, supra*, 411 U.S. at 807, 93 S.Ct. at 1826; *Sweeney, supra*, at 108; *Loeb v. Textron*, 600 F.2d 1003, 1011–12 n.5 (1st Cir. 1979). Nevertheless, the employer's defense must be designed to dispel the prima facie case. The defendants do not have to show they were actually motivated by the proffered reasons. It is sufficient if the defendants' evidence raises a genuine issue of fact as to the motivation behind the hiring decision. *Texas Department, supra*, 450 U.S. at 253, 101 S.Ct. at 1094, 25 F.Emp.Prac.Cas. at 116. As the First Circuit has stated,

The employer's stated legitimate reason must be reasonably articulated and non-discriminatory, but does not have to be a reason that the judge or jurors would act on or approve. Nor is an employer required to adopt the policy that will maximize the number of minorities, women, or older persons in his work force.... An employer is entitled to make his own policy and business judgments, and may, for example, fire an adequate employee if his reason is to hire one who will be even better, as long as this is not a pretext for discrimination.

The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one. The [trier of fact] must understand that its focus is to be on the employer's motivation, however, and not on its business judgment. *Loeb, supra*, 1012 n.6.

The defendants furnished ample evidence to rebut the initial presumption of unlawful sex discrimination. Defendants' nondiscriminatory reasons for the hiring decisions affecting Ms. Lamb center on the anti-inbred policy. Proof that this policy existed during the time in question itself raises a genuine issue of fact as to whether or not

the nonhirings of Ms. Lamb were discriminatory. The raising of this issue overcomes the presumption of unlawful discrimination. See *Texas Department, supra,* 450 U.S. at 253–254, 101 S.Ct. at 1094–1095, 25 F.Emp. Prac.Cas. at 116. Another reason offered by the defendants for their post-1972 hiring decisions was the establishing and implementing of their search committee/affirmative action hiring procedures which resulted, *inter alia,* in the hiring of Lorraine Shemesh to a position for which the plaintiff was qualified.

Since the defendants have met their burden of production and rebutted the inference of sex discrimination, the plaintiff is required to demonstrate by a preponderance of the evidence that the proffered reasons for the hiring decisions were merely pretexts for unlawful sex discrimination. *Texas Department, supra,* at 116; *McDonnell, supra,* 411 U.S. at 804, 93 S.Ct. at 1825; *Sweeney v. Board of Trustees of Keene State College, supra,* at 108.

The original invocation of the anti-inbred policy to support the decision not to rehire Ms. Lamb came in 1969, to be effective after the 1972 Spring Semester. After she *was* rehired for the 1972 Fall Semester, this policy was cited again as the reason why Ms. Lamb would not be rehired to the regular faculty after the 1972 Fall Semester. This reinvocation of the original 1969 policy decision occurred *after* Title VII became applicable to RISD. Thus, if the original 1969 application of the policy was a pretext for sex discrimination against Ms. Lamb (albeit non-actionable), then the 1972 re-application of the policy was probably pretextual as well. Therefore, the pre-March 24, 1972 evidence becomes relevant. *Hazelwood, supra,* 433 U.S. at 309 n.15, 97 S.Ct. at 2742 n.15.

The plaintiff has argued that the anti-inbred policy was not applied to Mr. Pelletier, a RISD graduate. She notes that, instead of not being rehired after the expiration of his 1970–71 contract, he received a three-year appointment. First, the plaintiff ignores, however, that she had notice of the policy prior to receiving her first one-year contract for 1969–70, and that Mr. Pelletier received no such notice prior to receiving his first one-year contract for 1968–69. Prior notice was shown to be a prerequisite to invocation of the policy. Second, and more significant, Mr. Pelletier fell within another exemption to the anti-inbred policy—he held a non-RISD degree. Finally, it is also pertinent that Ms. Lamb was not *replaced* after her 1970–71 contract expired. Based on these facts, the evidence does not support the argument that the *original* invocation of the anti-inbred policy in Ms. Lamb's case was pretextual.

Plaintiff also refers the Court to RISD's actions toward Mr. Casey. In 1972, the anti-inbred policy was applied to Mr. Casey, a male. This fact does not support the plaintiff's argument that the policy was selectively used as a pretext for sex discrimination. It is clear that the policy *was* applied inconsistently at RISD, but the available evidence shows that it was applied to both a male *and* a female, i.e., to Mr. Casey and Ms. Lamb. The sole question before the Court is whether RISD's policy was a pretext for sexual discrimination. *Loeb v. Textron,* 600 F.2d 1003, 1012 n.6 (1st Cir.1979). This evidence does not support the pretext theory.

The statistical evidence furnished by Ms. Lamb is also unhelpful to her pretext argument. As the defendants correctly point out, the plaintiff's statistics show the number of women on the RISD faculty and the percentage relative to men, but do not include any evidence of the number of *available* women *who were qualified* for RISD faculty positions. Under *Hazelwood, supra,* 433 U.S. at 308, 97 S.Ct. at 2741, and *Davis v. Califano, supra,* at 963, the plaintiff's statistical evidence is inconclusive as a ground of support for showing that RISD engaged in sex discrimination in its hiring practices.

Other evidence damaging to plaintiff's case is the hirings of Lorraine Shemesh and Victor Johnson (a member of minority) through the search committee/affirmative action hiring process for the 1973–74 academic year. These hirings exemplify

RISD's adherence to its newly developed affirmative action principles at that time. The existence of such a policy at RISD during that time undercuts any pretext argument offered by the plaintiff, particularly with regard to the 1973–74 hirings.[3]

As far as the hirings of Messrs. Newkirk, Carpenter, and Haynes are concerned, they also do not support the theory that the anti-inbred policy was a pretext for sex discrimination. In each instance, the man selected was a RISD graduate. However, each also had significant experience outside of RISD. Such experience was clearly shown to be an exception to application of the anti-inbred policy. These hirings do *not* show that the anti-inbred policy was not applied to men as plaintiff seems to argue.

Considering all the evidence, therefore, the plaintiff has failed to show by a preponderance of the evidence that the reasons articulated by the defendants for her not being given a permanent faculty appointment and for her not being considered for post–1972 regular faculty openings were pretexts for sex discrimination. Under *McDonnell* and *Texas Department*, her claims under 42 U.S.C. § 2000e–2 must fail. The plaintiff had the ultimate burden of demonstrating that, in its hiring decisions toward her, RISD did not treat her equally with similarly-situated males. *Texas Department, supra*, 450 U.S. at 253–254, 101 S.Ct. at 1094–1095, 25 Emp.Prac.Cas. at 115, 117. She failed to demonstrate this in the evidence presented to the Court.

### Retaliation in Hiring

The plaintiff's final contention is that RISD decided not to appoint her to the regular faculty after November, 1972 in retaliation for her filing of a Title VII complaint. If true, this contention would establish a violation of 42 U.S.C. § 2000e–3.

■ To establish such a violation, the plaintiff must initially demonstrate a link between her not being hired and the filing of her discrimination complaint. *Gunther v. County of Washington*, 602 F.2d 882, 892 (9th Cir.1979), *aff'd*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751, 25 F.Emp.Prac.Cas. 1521 (1981). The defendants' articulated reasons for not hiring Ms. Lamb to the regular faculty after 1972 are discussed in detail above. The standard of proof as to pretext and unlawful discrimination that applies to 42 U.S.C. § 2000e–2 is also applicable to 42 U.S.C. § 2000e–3 as well. *McCarthy v. Cortland County Community Action Program*, 487 F.Supp. 333, 339–40 (N.D.N.Y.1980).

■ The fact that the anti-inbred policy was applied to at least one other person in a non-retaliatory manner (Mr. Casey) does not support the plaintiff's theory of pretext. More important, the fact that RISD hired Ms. Lamb to its summer faculty three times *after* she filed her discrimination complaint against RISD constitutes significant evidence of a non-retaliatory motive in dealing with Ms. Lamb in RISD's overall hiring decisions. Such conduct by RISD is not consistent with a retaliatory motive. *See, e.g., Equal Employment Opportunity Commission v. Locals 14 & 15, International Union of Operating Engineers*, 438 F.Supp. 876 (S.D.N.Y.1977). Finally, the evidence did not show that Ms. Lamb was actually rejected when she inquired about a 1976 Summer position. After that occasion, she never applied for another summer faculty position.

On this evidence, the plaintiff has failed to establish by a preponderance of the evidence that RISD unlawfully retaliated against her by its failure to hire her to the regular faculty after November, 1972, or by its failure to hire her to a summer position after 1975. She has not shown that the articulated reasons for her non-hirings were a pretext for retaliation as required by *McDonnell* and *Texas Department*. She has not shown the "but for" causation required to prove a 42 U.S.C. § 2000e–3 viola-

---

**3.** Of course, this Court recognizes that the hiring of Ms. Shemesh, a woman, is far more probative of whether RISD discriminated against the plaintiff on the basis of sex than is the hiring of Mr. Johnson, a male member of a minority. However, both hirings are entitled to consideration.

tion under *Loeb v. Textron, supra,* at 1019, *Monteiro v. Poole Silver Co.,* 615 F.2d 4, 9 (1st Cir. 1980), and *Gunther, supra,* at 892.