Gracia **MELANSON**

v.

**Talbout RANTOUL, et al.**

**Civ. A. No. 75–0036.**

United States District Court,
D. Rhode Island.

March 17, 1982.

---

Marvin A. Brill, Providence, R. I., for plaintiff.

Peter J. McGinn, Richard A. Sherman, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

The plaintiff alleges she has been the subject of sex discrimination under Title VII, 42 U.S.C. § 2000e *et seq.* and violations of the Equal Pay Act, 29 U.S.C. § 206(d). In her post trial memorandum she invokes for the first time the additional theory of retaliatory employment practices directed against her in violation of 42 U.S.C. § 2000e–3.

Sublime simplicity is not a hallmark of the factual setting of this case and the plaintiff's statement that facts related to certain of the plaintiff's claims "do not lend themselves to chronological presentation" is in the main true. It is also true that there is much chaff mixed with the grain. Consequently, the Court apologizes for any prolixity in its findings of fact which may have resulted.

The plaintiff graduated from Syracuse University cum laude in 1960; she was awarded a Bachelor of Fine Arts degree. Following this she attended the defendants' school and received a Master of Fine Arts degree in 1962. Her employment at the Rhode Island School of Design started in 1960 as a graduate assistant and has continued to date uninterruptedly. She has advanced successively from an instructor in Nature Drawing to her appointment as an Assistant Professor in 1967 and then to Associate Professor in 1971. Throughout her career she has served on numerous academic and civic committees.

The plaintiff contends that because of her sex, she:

1. received a salary less than that received by male counterparts;

2. failed to receive promotion to full rank of professorship;

3. was denied appointment as chairperson of Freshman Foundation;

4. was not granted sabbatical leave in 1971 and 1979;

5. was denied appointment to the position of head of the new drawing department within the Freshman Foundation in 1971;

6. was denied appointment to the head of the nature program in July 1973;

7. was "exiled" from the Freshman Foundation staff by being removed from the roster of the Freshman Foundation faculty and given a heavier teaching load than her colleagues; she was assigned to teach courses in the Illustration Department; this was in retaliation for the commencement of her legal actions against RISD;

8. was precluded from membership on certain "important" faculty committees such as the Committee on Faculty Appointments; and

9. was denied tenure.

Each alleged incident will be discussed separately. With the agreement of the parties, the Court has incorporated into this case some of the evidence presented in *Myrna Lamb .v. Talbout Rantoul, et al.,* 538 F.Supp. 34 (D.R.I.1981), an analogous case against the same defendants.

*Denial of Appointment as Chairman of the Freshman Foundation*

The Freshman Foundation is a program which teaches figure drawing, two and three dimensional design, nature drawing, and certain other subjects to first year students at RISD. In April of 1973 a chairman was appointed for the department. It appears that Professor Melanson applied for that chairmanship, but a male, John Udvardy, was selected instead of her. The facts leading to this appointment start in September of 1972 when a search committee was formed. The plaintiff was invited to be a member of this committee but she refused because it would disqualify her as an applicant for the job. She told the Dean of the College, Donald Lay, of this aspiration. His reaction was one of surprise because, "after all" she was the "mother of two children and a wife." Mrs. Melanson's reaction was that the Dean's comment was an irrelevant non sequitur inasmuch as her role as a wife and mother had never interfered with her school responsibilities. Indeed, there was uncontradicted testimony that she always carried a full load of fifteen studio hours of teaching and in 1970 taught a double load for no extra pay. On November 15, 1972 she filed her application with the chairman of the search committee which had been formed. There were sixty candidates, twelve of whom were women and four of whom were black males.

Qualifications for the position were reputation and ability as an artist, administrative experience or promise, and the ability to work with and direct people. Another consideration, though not overriding, was the advantage of hiring a candidate from outside RISD to start "a fresh new program." (Tr. II pp. 63–64).

The committee made a special effort to attract black and female applicants. Some women on the faculty were asked if they were interested and the same was true as to at least one black teacher. In addition, the college advertised "that [it was] interested especially in candidacies of women and minority groups." The wide scope of this advertising was not questioned.

In due time Mrs. Melanson was interviewed as was John Udvardy. In all approximately twelve candidates were seen by the committee. The plaintiff points out, and the defendants do not dispute, that prior to making its decision, the search committee arranged a party for John Udvardy at the President's house. This was done so that all members of the Freshman Foundation "could get to know him better." The plaintiff was invited to this party as a faculty member and not as a candidate. It must be noted that John Udvardy was not a member of the school's faculty; at the time he was teaching at Brown University. A similar party was also given for another applicant, Mrs. Rockwell, who was also a candidate from outside the faculty. There were five preliminary finalists, Udvardy, Rockwell, David Brisson, Gerry Immonen and the plaintiff. Brisson and Immonen were professors at RISD. From this list Udvardy and Rockwell emerged as the finalists.

In April the school advised that the appointment would go to an "outsider." Udvardy was then selected by the committee and his name was sent to the faculty of the Freshman Foundation, which consisted of fifteen males and two women, who voted for his appointment. Udvardy was then named Chairman in April 1973. Specifically the defendants articulate the following 5 reasons for Udvardy's selection over the plaintiff:—a) strong recommendation from Udvardy's previous employer (Brown University); b) his qualifications as an artist; c) his promise as an administrator; d) the perception of the search committee that he

could run the division effectively; e) the search committee's belief that it would be advantageous to have someone outside RISD to chair the division.

In 1977 a new chairman of the Freshman Foundation, Earl Powell, was appointed. The plaintiff significantly emphasizes the evidence showing that this appointment was made without a search committee or advertising; that Powell had been at the defendant school in the Freshman Foundation since 1975 and was an assistant Professor; that he was proposed for the job by Udvardy, and no vote was taken by the faculty; and that applicants were limited to the faculty of the Freshman Foundation. In short, this was a selection process radically different from that employed by the defendants in 1972–73. All this evidence was presented by the plaintiff even though she was not a candidate for the job in 1977. However, she claims she would have sought the position if its specifications had not been changed. She "could not see [herself] accepting it on that basis," *i.e.* with the changed job requirements. The major change in the job description was that in 1977 there would be an eleven month schedule rather than a nine month schedule of teaching. The Court fails to see the relevance of this argument. There is not a scintilla of evidence that the job requirements were changed merely to make the position unattractive to the plaintiff.

In 1979 Mr. Powell resigned and Udvardy was reappointed chairman of the Freshman Foundation. Again there was no search committee, etc. A few members of the faculty were asked if they wanted the position—Mrs. Melanson was not so asked. It is the plaintiff's position she was "never given an opportunity" to apply.

The plaintiff argues that these facts certainly establish a prima facie case and, indeed, prove that the claimed reasons for hiring Udvardy were merely pretexts for unlawful sex discrimination. Paraphrasing her arguments and the Court's answer thereto, they are as follows: 1) including the plaintiff on the committee without first determining if she was interested in the job, demonstrated a sexist assumption that female faculty members were not interested. I realize that, at best, these cases are difficult to prove, but this assertion by the plaintiff is unwarranted. To the contrary, as has been set forth, the committee made a positive effort to solicit female applicants. 2) An affirmative action plan adopted by the school in 1973 urged consideration of candidates from within the school. True, there was some testimony to this effect, but more persuasively, there was evidence that from the outset the committee felt it would be advantageous to have a chairman from the outside. There had been an in-bred policy at RISD of hiring its own graduates as teachers and this practice was a concern substantially predating 1972. *See, Lamb v. Rantoul, supra* 538 F.Supp. at 38. 3) Mrs. Rockwell's selection as a finalist was "for appearance sake." I cannot accept this inference from the evidence. It is tantamount to saying that in a cunning way, the search committee planned to invite Mrs. Rockwell to submit her application with the premeditated evil of having her become one of the last two finalists against a man only as a shield against discriminatory accusations that might follow when the male was finally appointed. This goes too far. On the contrary, to me, it shows that a sincere effort was made to consider females with the ultimate objective of weighing qualifications. 4) Rockwell had the administrative experience qualification, whereas Udvardy did not. This argument also has to fall—the job requirement was administrative experience or "promise." Furthermore, Title VII does not require employers to make correct employment decisions. The statute requires only that sex not be a factor. *See, infra, Loeb v. Textron.* Finally, there was testimony that the committee simply did not feel that Mrs. Melanson had as much promise as an administrator as some of the other candidates and that, at that point in her career, she failed to demonstrate those qualities necessary to give unity to the Freshman Foundation so as to preserve it as a continuing entity. (*See* Tr. II pp. 303–304, 328 and ex. F).

As I stated in *Lamb v. Rantoul, supra,* the standard for establishing a violation of Title VII in sex discrimination cases is set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106 (1st Cir. 1979). Under this standard, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of unlawful sex discrimination. *McDonnell, supra* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department, supra,* 450 U.S. at 253, 101 S.Ct. at 1094. To establish this initial prima facie case, the plaintiff may show that:

(1) she is a member of a protected class.

(2) she applied for and was qualified for a position for which RISD was seeking applications.

(3) despite her qualifications she was rejected.

(4) Thereafter the position remained open and RISD continued to seek applicants with the plaintiff's qualifications.

*McDonnell, supra* at 802, 93 S.Ct. at 1824, *Texas Department, supra* 450 U.S. at 253 n.6, 101 S.Ct. at 1094 n.6.

 Even if I were to find that Mrs. Melanson established a prima facie case as to the 1973 appointment of Mr. Udvardy, the defendant has articulated legitimate non-discriminatory reasons for its action in not selecting Mrs. Melanson. "This burden is merely 'a burden of production' to articulate or state a valid reason. The burden of persuasion, however, remains at all times on the plaintiff." *McDonnell, supra* at 807, 93 S.Ct. at 1826; *Sweeney, supra* at 108; *Loeb v. Textron,* 600 F.2d 1003, 1011–12 n.5, (1st Cir. 1979). Nevertheless, the employer's defense must be designed to dispel the prima facie case. The defendants do not have to show they were actually motivated by the proffered reasons. It is sufficient if the defendants' evidence raises a genuine issue of fact as to the motivation behind the hiring decision. *Texas Department, supra,*

450 U.S. at 254–255, 101 S.Ct. at 1094. As the First Circuit has stated,

> The employer's stated legitimate reason must be reasonably articulated and non-discriminatory, but does not have to be a reason that the judge or jurors would act on or approve. Nor is an employer required to adopt the policy that will maximize the number of minorities, women, or older persons in his work force. . . .
>
> An employer is entitled to make his own policy and business judgments, and may, for example, fire an adequate employee if his reason is to hire one who will be even better, as long as this is not a pretext for discrimination.
>
> The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if, indeed it is one. The [trier of fact] must understand that its focus is to be on the employer's motivation, however, and not on its business judgment.
>
> *Loeb, supra,* 1012 n.6. *See Lamb v. Rantoul, supra,* 538 F.Supp. at 42.

As this Court sees the evidence, from 1969 when President Rantoul headed the college, policies were initiated to revitalize this institution. The problems associated with only drawing upon its own graduates, as the future teachers of the college are too self evident to need explanation. An accentuation of in-breeding is not healthy and this very valid concern was one of the motivating considerations in appointing Mr. Udvardy. In addition there was the committee's general evaluation of Mrs. Melanson. Juxtaposed with Mr. Udvardy, the committee felt she did not measure up. I find nothing in the plaintiff's evidence which demonstrates by a preponderance of the evidence that the proffered reasons for appointing Udvardy were merely pretexts for unlawful discrimination. *Texas Department, supra* 450 U.S. at 253–254, 101 S.Ct. at 1093–1094; *McDonnell, supra,* 411 U.S. at 804, 93 S.Ct. at 1825; *Sweeney v. Board of Trustees of Keene State College, supra* at 108.

I must conclude that under *McDonnell* and *Texas Department*, Mrs. Melanson's claim under 42 U.S.C. § 2000e–2 must fail. She had the ultimate burden of demonstrating that, in failing to appoint her to the chairmanship in 1973 RISD did not treat her equally with similarly situated males. *Texas Department, supra* 450 U.S. at 253–256, 101 S.Ct. at 1094–1095. As I view and weigh the evidence the plaintiff has failed to carry her ultimate burden of persuasion. As for the plaintiff's contention that in 1977 she did not seek the chairmanship because the job requirements had been changed, I don't know what she is trying to prove from this. A plaintiff must apply for a specific position or appointment when attempting to establish a prima facie case. True, "*McDonnell* itself stresses that the prima facie elements required may vary depending upon different factual situations. *McDonnell, supra* [411 U.S.] at 802 n.13 [93 S.Ct. at 1824 n.13]. The method of meeting the initial burden was never intended to be rigid, mechanized, or ritualistic. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577 [98 S.Ct. 2943, 2949, 57 L.Ed.2d 957] (1978); *Davis v. Califano, supra* [613 F.2d 957], at 961 [D.C.Cir.1979]. Furthermore, the law will not require a futile act. *See, e.g., Halprin v. Babbitt,* 303 F.2d 138, 141 (1st Cir. 1962)." *Lamb v. Rantoul, supra.* However, plaintiff does not attempt to make out a prima facie case with respect to the 1977 appointment by an alternative method. Having failed to apply in a timely manner, it cannot be inferred that she was discriminated against.

In 1979 she states she was not given the opportunity to apply for the current vacancy of chairman for the Freshman Foundation. Since this was neither briefed nor argued, it is not before this Court for consideration.

In ruling on this facet of the case the Court is not unmindful of the vastly different procedures adopted by the defendant in filling the chairmanship in 1973 as against those it used in 1977 and 1979. Yet it must be remembered that the in-bred policy in 1973 was a consideration, though not an "overriding" one. And since the plaintiff did not apply in 1977 and no issue is being made of the 1979 appointment, and no evidence was developed as to the different approaches, it is not for the Court to delve into this area *sua sponte.* This is especially true since I find the consideration was genuine in '73. I'll not speculate why it wasn't discussed in '77 and '79.

*Nature Drawing Laboratory*

The Nature Lab is a collection of all types of organic structures, both living and dead, such as shells, birds, bees and wooden skulls; it was described as including "a tremendous variety of specimens." This lab was envisioned, created and owned by Edna Lawrence, who had been teaching at RISD since 1922. The plaintiff worked with Miss Lawrence from 1960 to 1973.

In 1971, in conjunction with plaintiff's development of a nature program for the school, Mrs. Melanson met with William Benbow, Director of Development of the College and subsequently with the Dean. All this resulted in an application for a federal grant. It was understood that at some point Miss Lawrence would be retiring so Mr. Benbow asked plaintiff if she wished to put her name on the grant as director of the lab. Mrs. Melanson refused because, as she put it, "at that time Edna Lawrence had not retired, I felt that this (applying for the position) was premature and I felt that I didn't want to be in a position of prematurely pushing Edna out." (Tr. I p. 129). However, in Mrs. Melanson's grant application in long hand there was written and signed by the President and Dean of the College, "Mrs. Melanson will carry on the RISD Nature Lab after Miss Lawrence's retirement." In 1972 when Miss Lawrence did retire, Mrs. Melanson told the Dean she wanted the job. It is her position that in spite of this she was not included in any of the discussions by department heads concerning Miss Lawrence's replacement. She further claims she was ignored to the point that her Division Head, Mr. Hohannesian, refused to talk to her. The plaintiff concedes she never formally submitted her name for the job. She claims

she did not do so because, "[t]here was no direct way that I had of knowing that there was a search going on at the time . . . and I was in a position of certainly not being able to make application." (Tr. I p. 130).

A James Carpenter, less qualified than Mrs. Melanson, was appointed in July of 1973. Brice Hobbs, Head of Drawing in the Freshman Foundation and a member of the search committee that had been formed, testified that Miss Lawrence was given the responsibility of selecting her successor, and she chose Carpenter. The reason for the delegation of this responsibility was, as he stated, "there was a search committee formed and we met once or twice and the conclusion we had come to that everybody was in kind trying to manipulate what was going to happen to the nature collection and Edna, who had created this department, was not being brought in as actively as we would like and so it was our conclusion after one or two meetings that she be given the total say in terms of who succeeded her." (Tr. II p. 238).

The plaintiff's argument is that it is inconceivable that Edna Lawrence who had never risen higher than an assistant professor would be given the responsibility to name her successor. The logic of this argument eludes me. It ignores the dominant facts motivating the shift of selection responsibility to Miss Lawrence—simply speaking she created the Nature Lab, and owned the collection which the college obviously wanted, and hoped to have on her retirement. Whether this was a good or bad approach for the committee to take is not the point. One thing is certain—it was not with a sex-based discriminatory motive. See Loeb, supra 1012, n.6.

Furthermore, I have reservations concerning Mrs. Melanson's alleged inability to seek the job because of her claimed ignorance of developments in the search to find Miss Lawrence's successor. In cross-examination, after being confronted with her deposition at odds with her categorical assertion of ignorance, she admitted that her testimony "concerning an absolute lack of knowledge concerning the search going on was incorrect." (Tr. II pp. 286, 289).

As this Court sees it, Mrs. Melanson has failed to raise even a *prima facie* claim as to this job; and if we want to go beyond this, certainly RISD has articulated nondiscriminatory reasons for hiring Carpenter which have not been proven to be pretextual.

*Drawing Department Head*

 In 1971, a male, Brice Hobbs, was appointed head of the Drawing Department. The plaintiff contends she should have received this job because she proved her entitlement through a teaching program she developed. In April 1971, the plaintiff developed a detailed proposal creating a drawing program for freshmen. For part of the time Mrs. Melanson collaborated with Brice Hobbs, a male colleague in the Freshman Foundation. She contends that at this time Mr. Hobbs also presented a proposed drawing program under his own name, but that it was in fact a plagiarism of her work; and that in spite of this plagiarism he was the one chosen to head the department. In my opinion this claim is not worthy of any extended discussion. To begin with Mr. Hobbs was offered a co-chairmanship together with Mrs. Melanson—this the plaintiff refused. It is not for this Court to determine whether or not works submitted by academics in the college setting, judged by their peers, are or are not original creations; and it is undisputed that the plaintiff was offered the position as co-head of the department, which she declined. This allegation of discrimination must be summarily denied. Further, the appointment of Hobbs took place in 1971, prior to the application of Title VII to professional employees, see infra. Since I find no merit to this contention, I need not discuss the plaintiff's argument that the incident, although it pre-dated the Act, is nevertheless relevant "because it sets in motion a chain of consequences which affected the status of Melanson—a female." Post Trial Memorandum p. 21.

*Failure to Promote Plaintiff to Full Professorship*

 The disturbing feature of this case and more especially this particular issue, is

the shower of facts rained down upon the Court without any discernible development or direction. This is not a class action suit. It is an individual claim and requires specific proof of the allegations made against the defendant. A plethora of figures and statistics, in and of themselves, are not enough to establish even a prima facie case of sex discrimination in the failure to promote the plaintiff. There must be some evidentiary basis by which the Court can compare the plaintiff with those who were promoted to full professor. This record is devoid of the evidence necessary to make such a comparison.

The sum total of the plaintiff's argument is that RISD had and still has a subjective promotion process. Recommendations for promotion must first come from department heads, who, prior to 1974–75 were all male, and no objective standards are used. The process is therefore suspect because of its capacity for masking bias. In such a setting, statistical evidence may establish an inference of discriminatory animus eliminating the need to present specific instances of discrimination to establish a prima facie case of discrimination in an individual action as well as in a class action. Statistics show that in 1972–73—4% of faculty were female associate professors; 1976–1977—13%; 1980–81—11%. In the rank of assistant professor the percentage of women were: 1972–1973—3%; 1980–1981—19%. A similar comparison for part-time instructors, adjuncts and instructors reveals women were employed in much higher percentages. Finally, the analysis shows 100% of the full professors were male. The plaintiff then butresses her position by pointing out that in 1976, in spite of a freeze placed on promotions to full professorship, three males were so promoted.

Promotions to the rank of full Professor at RISD are initiated by the Division Chairperson. After the chairperson's recommendation to the Committee on Faculty Appointments (CFA), the CFA follows certain standards of review set forth in a "Kerchenbaum Plan" contained in the RISD faculty handbook. (This plan has never been formally adopted by RISD). The CFA in turn makes its recommendation on promotion to the Dean, who in turn makes a recommendation to the President. The President's recommendation next goes to the Board of Trustees for final approval. There is no consideration for promotion, therefore, if there is no initial recommendation made by the Division chairperson. The plaintiff has never been recommended for the rank of full Professor, and consequently has never been rejected as a candidate for that rank.

The defendant responds by emphasizing that the standards for promotion to full professorship are all set forth in the RISD handbook; that the only members of the Freshman Foundation, the division in which Melanson has been employed, to be promoted to full professorship were a George Pappas (hired in 1955, eight years before Melanson), Garabed De Hohannesian (division chairperson of the Foundation for many years), and Merlin Szosz (hired three years before Melanson). The defendant contends further that the plaintiff was not promoted to full professorship because the chairman of the Freshman Foundation did not recommend anyone and that three other males (Immonen, Hobbs and Udvardy), who Melanson concedes equaled her qualifications, also were not promoted. On February 18, 1976, the RISD Board of Trustees enacted a freeze on any further promotions to the rank of full Professor throughout RISD. The freeze was lifted in 1979. Since that time no faculty member in Freshman Foundation has been recommended for full professorship.

Based on this record I cannot find that the plaintiff was a victim of sex discrimination in the promotion process at RISD. First, taking the evidence as a whole, without trying to sift it into categories germane to the progressive stages of proof as laid out in Title VII cases, I do not find even a *prima facie* case. The statistical evidence does not help without some evidence as to the availability of comparably qualified women. Indeed, in this case there is no comparison of the plaintiff excepting as already shown, as to Immonen, Hobbs and

Udvardy of equal qualifications who were not promoted.

The plaintiff's failure to make comparisons, the inadequacy of her statistics, the evidence of other males of equal qualifications to the plaintiff not being promoted, the fact that only males senior in tenure or department heads were promoted are all fatal to the plaintiff's claim that she was not promoted to full professor because of her sex.

These conclusions are not in any way disturbed by application of the *McDonnell Douglas, Sweeney, supra* decisional analysis. *McDonnell Douglas* itself indicates that the 4-step prima facie analysis may be varied depending upon differing factual situations. *Id.*, 411 U.S. at 802, n.13, 93 S.Ct. at 1824, n.13. Unlike *Sweeney*, here the promotion process was never initiated so plaintiff was never rejected. When presented with this difficulty and the need to vary the requirements for the plaintiff to meet her initial burden, the plaintiff can establish a *prima facie* case by showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII. *Orahood v. Board of Trustees, Univ. of Arkansas*, 645 F.2d 651, 654–55 (8th Cir. 1981), citing *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

To do this the plaintiff turns to the statistical evidence. I have already commented on its inadequacy. However, it may be argued that the statistical evidence, particularly the fact that no woman has ever achieved the rank of full Professor at RISD, combined with the promotion of some male Freshman Foundation faculty members to that rank, help support an inference of sex discrimination. Assuming *arguendo*, that in this context the plaintiff has met her initial *prima facie* burden, the burden of production shifted to the defendants to articulate legitimate, nondiscriminatory reasons for failing to promote Melanson. The defendants did offer legitimate

nondiscriminatory explanations, set forth *supra*. These reasons having been presented, it became the plaintiff's burden to demonstrate by a preponderance of the evidence that these reasons were not true but rather constituted pretexts for unlawful sex discrimination. Here the plaintiff has failed. The statistics offered were inadequate— and that is all the plaintiff proffers. Standing by themselves they do not meet the burden of proof. *Sweeney, supra* at 113 n.11. And in terms of factual accuracy, the existence of the articulated reasons as objective facts was never disputed by the plaintiff. The plaintiff's Title VII claim for not being promoted to full Professor must be dismissed.

*Plaintiff's Allegation that she has been Precluded from Membership on "Important" Faculty Committees*

■ Plaintiff's complaint in this regard centers on her not being appointed to serve on the CFA, which she described as the most important faculty committee at RISD. She has served on several other faculty committees including the Instruction Committee and the Task Force on Affirmative Action. At least one woman faculty member has served on the CFA during the 1973–74 and 1974–75 academic years. The plaintiff was also aggrieved at being assigned to "Committee B" instead of "Committee A," both composed of Freshman Foundation faculty members, in 1978–79.

To say the least, this Court is not in a position to determine which committees are "important" and which are "not important." There was little, if any, evidence to guide the Court in determining *when* and *how* such committee appointments were made. Given this set of facts, the plaintiff has failed to meet even her initial *prima facie* burden under *McDonnell Douglas, supra*, and *Texas Department, supra*. This aspect of her Title VII complaint is likewise dismissed.

*Denial of Plaintiff's Application for Sabbatical in 1979*

■ By the plaintiff's own testimony, she was ineligible under RISD's union contract for a sabbatical when she applied for

this in 1979. This ineligibility resulted from the fact that her previous sabbatical in 1976–77 was so recent. Under these facts there is no basis under which even an initial *prima facie* showing could be established. *Id.* The plaintiff's first application for a sabbatical occurred in a letter dated January 27, 1972. Regardless of the sexual discrimination that may or may not have gone with that denial by RISD it was not actionable because the decision pre-dated March 24, 1972. *See infra.*

*Plaintiff's "Exile" From Freshman Foundation in 1973–74*

■ After several "last minute" assignment changes immediately prior to the 1973–74 academic year, the plaintiff was assigned to teach in the Illustration Department and was assigned to teach an unusually large number of students. She claims that these actions were taken in retaliation for her July 1973 filing with the EEOC. The defendants assert that this assignment was merely a rotation teaching assignment and that such rotations were common within the Division of Freshman Foundation. Indeed, the Court is satisfied that such rotations in teaching assignments are common at RISD.

Retaliation for a person's protected Title VII activities is a violation of 42 U.S.C. § 2000e–3. The standards of proof of pretext and unlawful discrimination (*McDonnell Douglas, supra*, and *Texas Department, supra*) which apply to § 2000e–2 cases apply also to cases of retaliation under § 2000e–3. *McCarthy v. Courtland County Community Action Program*, 487 F.Supp. 333, 339–40 (N.D.N.Y.1980). While the assignment to the Illustration Department and the unpleasant features that accompanied that assignment took place shortly after the plaintiff's EEOC filing, that factor alone will not support a finding of retaliation under 42 U.S.C. § 2000e–3. Assuming *arguendo* that this *is* enough to establish a *prima facie* case of retaliation, the plaintiff failed to establish by a preponderance of the evidence that the rotation was a pretext for retaliation. *McDonnell Douglas, supra*,

and *Texas Department, supra.* She simply failed to show the "but for" causation required to prove a 42 U.S.C. § 2000e–3 violation. *Loeb v. Textron*, 600 F.2d 1003, 1019 (1st Cir. 1979).

*Tenure*

RISD's practice of giving faculty members tenure was abolished in 1970 by faculty vote. It was established at trial that the plaintiff would not have been eligible for tenure prior to 1971 under the pre-1970 tenure system in any event. Even if the plaintiff had been discriminated against under the pre-1970 RISD tenure system, that discrimination would not be actionable. Title VII's provisions were not made applicable to educational institutions prior to March 24, 1972 and cannot be applied retroactively. *Weise v. Syracuse University*, 522 F.2d 397, 410–411 (2d Cir. 1975).

*Salary Less than that Received by Male Counterparts:—Employment prior to July 1, 1972*

■ Here, as in *Lamb, supra*, alleged violations of the Equal Pay Act for the years prior to July 1, 1972 are not before me because no cause of action exists. This was fully discussed in *Lamb v. Rantoul, supra*, 538 F.Supp. 34, 36–37 (D.R.I. 1981). For ease of reading the same is adopted for this case and is repeated here. "The plaintiff's Equal Pay Act claim is grounded upon section 6 of the Act, 29 U.S.C. § 206(d)(1), which reads as follows:

(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of·production; or (iv)

a differential based on any other factor other than sex; *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

Before [Mrs. Melanson] can claim protection under this provision, she must be an employee not excluded from § 206(d)(1) by 29 U.S.C. § 213(a)(1). § 213 provides:

(a) The provisions of sections 6 (*except* section 6(d) in the case of paragraph (1) of this subsection) and 7 [29 U.S.C. §§ 206, 207] shall not apply with respect to—

(1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of the Administrative Procedure Act except ... [that] an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities).... (emphasis added).

*Id.* § 213(a)(1).

Prior to July 1, 1972, the parenthetical phrase 'except section 6(d) in the case of paragraph (1) of this subsection' was *not* part of 29 U.S.C. § 213(a)(1). That phrase was added by an Act of Congress on June 23, 1972, 86 Stat. 375 (1972), *reprinted in* [1972] U.S.Code Cong. & Ad.News 447. Thus, prior to July 1, 1972, no 'executive, administrative, or professional' employees were protected by the Equal Pay Act. Simply put, if [Mrs. Melanson] was a 'profes-

sional' under the unamended Equal Pay Act, then she cannot prevail on her claim for RISD periods of employment that occurred prior to July 1, 1972. *See* 29 C.F.R. § 541.5(b) (1980). [Her status as a professional simply cannot be questioned].

Pursuant to 29 U.S.C. § 213(a)(1), the Secretary of Labor has promulgated regulations defining the term 'professional' under the Equal Pay Act. Under the pertinent regulation, virtually unchanged since at least 1958, an 'employee employed in a bona fide professional capacity' under the Equal Pay Act includes any employee whose primary duty consists of the performance of

work requiring knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes.

29 C.F.R. § 541.3(a)(1) (1980); 29 C.F.R. § 541.3(a)(1) (1958). *See Craig v. Far West Engineering Co.,* 265 F.2d 251, 256 n.6 (9th Cir.), *cert. denied,* 361 U.S. 816, 80 S.Ct. 57, 4 L.Ed.2d 63 (1959)....

The plaintiff argues that the 1966 Amendment to 29 U.S.C. § 213(a)(1), which added the parenthetical phrase 'including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools' after the term 'professional capacity', represents a legislative intent to exclude *college-level* educators from the statutory exemption for professionals. In other words, the plaintiff is arguing that *elementary* and *secondary* school teachers are 'professionals' (and therefore excluded from the Equal Pay Act prior to July 1, 1972), but that *college* teachers are not 'professionals' (and therefore protected by the Equal Pay Act prior to July 1, 1972).

This argument is neither appealing nor pragmatic. The legislative history of the 1966 Amendment does not support the argument, discussing only the exclusion of elementary and secondary school teachers

from the protection of the Equal Pay Act. *See* S.Rep. No. 1487, 89th Cong., 2d Sess., *reprinted in,* [1966] U.S.Code Cong. & Ad. News 3002, 3010. Furthermore, the term "including" at the beginning of the parenthetical phrase is ordinarily an expansive term, not a term of limitation. In short, neither legislative history nor case law supports the plaintiff's interpretation.

Clearly, Melanson's claims concerning her salary levels in 1969–1970, 1970–1971, and 1971–1972 must be denied and dismissed as a matter of law.

The defendants assert that the 1972–73 salary claim under the Equal Pay Act is barred by the statutory period of limitations. 29 U.S.C. § 255(a) provides for a two year statute of limitations, measured from the date the cause of action accrued to the date the Equal Pay Act complaint was filed in court, unless the cause of action arose out of a willful violation by the defendants. Under the latter circumstance, there is a three year statute of limitations. *Id.* (The plaintiff's 1973 filing with the EEOC pursuant to Title VII does *not* toll the Equal Pay Act statute of limitations because the two statutes provide for independent avenues of relief. *Stansell v. Sherwin-Williams Co.,* 404 F.Supp. 696, 701 (N.D.Ga.1975), citing *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).) The plaintiff argues that the defendants' discriminatory acts toward her were willful and that a three year statutory period (measured back from February 9, 1975) should apply. The defendants argue that no such willfulness has been shown.

In order to prove "willful" discrimination under 29 U.S.C. § 255(a), the plaintiff need not prove that RISD entertained a bad purpose or an evil intent. Rather, an employer's discriminatory act is "willful when he is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt." *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 461–62 (D.C.Cir.1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792.

*See also Dunlop v. State of Rhode Island,* 398 F.Supp. 1269, 1274–75 (D.R.I.1975).

The plaintiff was offered her 1972–73 base salary of $11,600 by letter dated March 31, 1972. She accepted the offer by her signature on April 23, 1972. Plaintiff's salary level for 1972–73 thus was established prior to July 1, 1972, the effective date of the amendment which made the Equal Pay Act applicable to the plaintiff. It is therefore possible that the Equal Pay Act would not apply to plaintiff's salary in 1972–73. The Court need not decide, however, if the Act is applicable to discriminatory payment arrangements that were entered into prior to the effective date of the amendment, but which have an effect on the level of wages paid after the effective date. The mere fact that there is significant uncertainty as to whether the Equal Pay Act would apply to the plaintiff's salary in 1972–73 is sufficient to show that any violation of the Act in this regard was not willful. The three-year statute of limitations for willful violations, therefore does not apply in this case, and plaintiff's claims relative to her salary in 1972–73 are time barred. This being the case, only the plaintiff's RISD salaries from the 1973–74 academic year through the 1979–80 academic year will be considered under the Equal Pay Act.

The parties in this case did not incisively analyze the provisions of Title VII and the Equal Pay Act in reference to each other. The exordium which follows is set forth since the plaintiff has invoked the protection of both Title VII (42 U.S.C. § 2000e-5) and the Equal Pay Act (29 U.S.C. § 206(d)(1)) relative to her claim that she has been consistently paid less by RISD than have similarly situated males. For further analysis *see Laffey, supra* at 445–46; *Shultz v. Wheaton Glass Co.,* 421 F.2d 259, 266 (3rd Cir. 1970), *cert. denied* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64; *DiSalvo v. Chamber of Commerce,* 416 F.Supp. 844, 852 (W.D.Mo.1976), *modified on other grounds,* 8 Cir., 568 F.2d 593.

■ In order to make out a *prima facie* case of sex discrimination in wages under the Equal Pay Act, a plaintiff's initial burden is to show that the defendant employer paid higher wages to male faculty members for equal work on jobs the performance of which required equal skill, effort and responsibility under similar working conditions. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). Once this *prima facie* case is established, the burden of proof shifts to the defendant employer to show that the male was paid more than the female because of one of the exceptions listed under the Equal Pay Act, 29 U.S.C. § 206(d)(1)(i–iv). *Id.* at 196, 94 S.Ct. at 2229. The defendant employer's burden of establishing that one of the four exceptions in § 206(d)(1) applies is in the nature of an affirmative defense. *See* 7 A.L.R.Fed. 707, 741.

■ This legal standard is quite different from the legal standard employed in a claim brought solely on the basis of Title VII. As already explained, under Title VII once the plaintiff has established a *prima facie* case the defendant need only *articulate* a legitimate, nondiscriminatory reason for the action claimed to be discriminatory. *McDonnell Douglas, supra; Texas Department, supra*, 450 U.S. at 254–255, 101 S.Ct. at 1094–1095. Once this articulation is made in a Title VII action, the plaintiff must then establish that the articulated reason given by the defendant was a pretext for unlawful sex discrimination. *Id.* In a case brought exclusively under Title VII, the burden of proof never shifts to the defendant; under the Equal Pay Act, however, the burden of proof does shift to the defendant once the plaintiff meets the initial *prima facie* burden. *Corning Glass Works, supra.*

■ When the issue of salary differentials can be brought under both statutes, the legal standards established under the Equal Pay Act controls. *Laffey, supra*, at 446; *Re National Airlines, Inc.*, 434 F.Supp. 249, 257 (S.D.Fla.1977). Indeed Title VII itself, at 42 U.S.C. § 2000e–2(h) refers specifically to the Equal Pay Act and states that a sex-predicated wage differential is immune from attack under Title VII only if it comes within one of the four enumerated exceptions to the Equal Pay Act. *Id. See also Laffey, supra.* It simply cannot be asserted that Title VII's standard supplants or undermines the standards established under the Equal Pay Act. *Laffey, supra. See also Equal Employment Opportunity Commission v. Colby College*, 439 F.Supp. 631, 634–635 (D.Me.1977), *rev'd* on other grounds, 1 Cir., 589 F.2d 1139.

■ Whether or not there exists a prohibited sex based wage differential is dependent on a showing that the work is equal in terms of skill, effort, responsibility and is performed under similar working conditions. *Brennan v. Corning Glass Works*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). As a general proposition, the term "equal" is one of "substantial equality." *Usery v. Allegheny County Institution District*, 544 F.2d 148, 153 n.4 (3rd Cir. 1976); *Katz v. School District of Clayton*, 557 F.2d 153, 156 (8th Cir. 1977); *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3rd Cir. 1970), *cert. denied* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). Comparison of jobs requires that the duties 1) be "closely related" or "very much alike," *Hodgson v. Miller Brewing Co.*, 457 F.2d 221, 227 (7th Cir. 1972); and 2) require substantially equal skill, effort and responsibility under similar working conditions. *Hodgson v. Corning Glass Works*, 474 F.2d 226, 234 (2nd Cir. 1973), *aff'd*, 417 U.S. 188, 203–204, n.24, 94 S.Ct. 2223, 2232 n.24, 41 L.Ed.2d 1. In making these determinations one looks to the "actual job performance and content—not job titles, classifications or descriptions." *Gunther v. County of Washington*, 623 F.2d 1303, 1309 (9th Cir. 1979), *aff'd*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

■ The Court should not engage in job rating, but as the Seventh Circuit stated:

We agree that the Equal Pay Act does not authorize courts to equalize wages merely because they find that two sub-

stantially different jobs are worth the same monetarily to the employer and therefore, should be paid the same wages. However, "[t]here is evidence that Congress intended that jobs of the same or closely related character should be compared in applying the equal pay for equal work standard...."

*Hodgson v. Miller Brewing Company,* 457 F.2d 221 at 227 (7th Cir. 1972).

The hard question before the Court concerns the application of these criteria to the comparison that must be made. This in turn raises the inquiry of who is to be compared with whom. From the maze of facts in this case, the Court *sua sponte* laboriously has ferreted out the necessary evidence to resolve the Equal Pay issue.

■ The plaintiff argued that the Court should compare her salary to the average salary of male associate professors at RISD, noting that her salary is consistently lower than this average. I cannot do this without a showing that each associate professor's position requires, *inter alia*, equal skill. There is simply no such evidence in this record. The inclusion of all categories does not reflect a true picture of the salary conditions at the school; the evidence shows that the plaintiff's division of the Freshman Foundation is the lowest paid among all Divisions at RISD. The comparison to be made must be the plaintiff's salary levels with those of similarly situated males in the teaching structure. Comparisons were also made by the plaintiff as to the Illustration Department (Division of Design) and the Division of Architectural Studies. I discount the latter two: it is clear that architectural studies involve substantially different skills (*e.g.*, a degree in Architectural Engineering). The Illustration Department comparison fails for lack of evidence as to skills required to teach in that Department as a whole. The attempt to compare with

Sgouras is of no avail, if for no other reason than his service as head of the Department or as Chairman of the Division of Design. He had more responsibility and therefore his position cannot be characterized as equal. *See* 29 C.F.R. §§ 800.122 and 800.130; *Orahood v. Board of Trustees, Univ. of Arkansas,* 645 F.2d 651, 654–55 (8th Cir. 1981).

This leaves the Court with the salaries of the male faculty members in Freshman Foundation to compare to the plaintiff's salary. As I review this record, the defendants do not really contend that the faculty positions in Freshman Foundation, in terms of skill, effort, responsibility and working conditions are not substantially equal.

An amorphous standard existed at RISD for fixing faculty salaries as a whole. The testimony indicated that salaries are basically in the hands of the individual Division Chairmen who make a recommendation on salary to the Committee on Faculty Appointments (CFA). The CFA in turn seeks the recommendation's approval from the Vice-President for Academic Affairs, who then passes the recommendation to the President and EEO Officer. Finally, the recommendation is placed before the Board of Trustees for approval. There was also evidence to the effect that artistic achievement and teaching ability has had some bearing on *hiring* decisions, but it was not clear if such considerations were factored into the initial salary recommendation for a faculty member, or if so, how this was done.

From this record, the only comparisons I find of faculty members in equal positions are Pappas and Szosz (full Professors); Massey, Keck and Powell (assistant professors paid more than the plaintiff); and Hobbs, Brisson, Immonen and Udvardy.

The comparisons break down as follows:

| NAME | Year of Promotion to Assoc. Prof. | 1973–74 | 1974 75 | 1975 76 | 1976 77 | 1977 78 | 1978 79 | 1979 -80 |
|---|---|---|---|---|---|---|---|---|
| Melanson * | 1971 | 13,200 * | 14,400 | 15,500 | 15,800 | 16,750 | 17,650 | 20,486 * |
| Brisson | 1970 | 13,250 | 14,400 | 15,500 | 15,800 | 16,750 | 17,600 | 18,977 |
| Hobbs | 1971 | 13,500 | 14,700 | 15,800 | 16,100 | 17,100 | 17,950 | 19,207 |

| NAME | Year of Promotion to Assoc. Prof. | 1973–74 | 1974–75 | 1975 76 | 1976–77 | 1977 78 | 1978–79 | 1979 -80 |
|---|---|---|---|---|---|---|---|---|
| Immonen | 1970 | 14,200 | 15,200 | 16,300 | 16,600 | 17,600 | 18,600 | 18,900 |
| Udvardy | 1973 | 16,000 | 17,500 | 18,600 | 19,600 | 20,800 | 20,800 | 25,856 |
| Pappas ** | 1969 | 14,600 | 15,900 | 17,100 | 17,400 | 18,450 | N/A | N/A |
| Szosz *** | 1969 | N/A | N/A | N/A | N/A | 18,550 | 19,600 | 20,972 |
| Massey | N/A | N/A | N/A | N/A | 15,200 | 16,900 | 17,750 | 18,993 |
| Keck | N/A | N/A | N/A | N/A | 15,800 | 16,750 | 17,700 | 18,939 |
| Powell | N/A | N/A | N/A | N/A | 11,500 | 16,500 | 19,000 | N/A |

* Notwithstanding the plaintiff's "limbo" argument regarding her status in 1973-74, she was administratively assigned to the Division of Freshman Foundation for that year. As far as her 1979 80 salary is concerned, the plaintiff provided discrepant figures as to what that salary was. Exhibit 21 showed it to be $20,486, while exhibit 50 shows it to have been $18,886. Since it was part of her initial burden to establish the salary, the higher figure is being used.

** Professor Pappas was promoted to full Professor in 1973–74 and retained that rank throughout. He was on sabbatical and received half pay ($9,750) for 1978–79, and was on an unpaid leave of absence in 1979 80.

*** Professor Szosz became a member of RISD's Administration in 1972 73 (Associate Dean and later Acting Provost). He became full Professor in 1975–76. He served strictly as a teacher in Freshman Foundation only in the years 1977-78 through 1979–80.

Assistant Professors Massey, Keck and Powell were identified by cross referencing exhibit 29 with exhibit 21.

### Associate Professor Brisson

██ The record shows that Brisson was paid $50. more than the plaintiff, but only in 1973–74. As to that year, however, the plaintiff has established her prima facie case under *Corning Glass Works, supra.* Any wage differential, no matter how small, is sufficient under the Equal Pay Act. *Hodgson v. American Bank of Commerce,* 447 F.2d 416, 420 (5th Cir. 1971). Once the plaintiff established her prima facie case vis a vis Brisson, the burden shifts to the defendants to show that the male was paid more than the plaintiff under one of the exceptions listed in the Equal Pay Act; *i.e.* that the higher payment to Brisson was made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex. *Corning Glass Works, supra,* 417 U.S. at 196, 94 S.Ct. at 2229; 29 U.S.C. § 206(d)(1). Brisson had a year in the rank of Associate Professor before the plaintiff, but the record demonstrates that rank is not necessarily a factor in determining salary. The record shows that Brisson began teaching at RISD two years *after* the plaintiff, so seniority at the school could not explain the difference.

██ The defendants never established the existence of a merit *system* in the salary-setting framework or of a *system* measuring the quality of a faculty member's work in setting salary recommendations. While there was some testimony questioning the quality of the plaintiff's post-1971 teaching performance, no objective standards were presented for measuring such performance. The following language from *Marshall v. Georgia Southwestern College,* 489 F.Supp. 1322, 1330 (M.D.Ga.1980), is pertinent here:

> The court concludes that the defendants have failed to establish the existence of a bona fide merit system. The merit system exception "if not strictly construed against the employer, could easily 'swallow the rule'.... The employer must show that its 'merit system' is administered, if not formally, at least systematically and objectively." "[S]ubjective evaluations of the employer cannot stand alone as a basis for salary discrimination based on sex." (citations omitted).

### Associate Professor Hobbs

In 1973–74, Hobbs held the administrative post of Head of the Drawing Depart-

ment, a position for which he received no additional compensation. His 1973–74 salary cannot, therefore be compared with the plaintiff's. *Orahood, supra,* 29 C.F.R. §§ 800.122 and 130.

In 1974–75, Hobbs received $300 more than the plaintiff for no explicable reason. It has already been established that Freshman Foundation faculty salaries were not set in accordance with the exceptions set forth in 29 U.S.C. § 206(d)(1)(i), (ii), or (iii). As far as considering the possibility of the existence of an explanation other than sex for the difference, *i.e.* an exception under § 206(d)(1)(iv), it is noted that Hobbs' highest degree is a BFA, although he does have some graduate training as well. He began teaching at RISD in 1964, one year after the plaintiff. There is no justification on the record for his higher salary. Having failed to meet their burden of establishing the existence of an exception under § 206(d)(1) vis à vis Hobbs, the defendants discriminated against the plaintiff in violation of that provision in the amount of $300 for 1974–75, $300 for 1975–76, $300 for 1976–77, $350 for 1977–78, and $300 for 1978–79. *Corning Glass Works, supra; Marshall v. Georgia Southwestern College, supra.*

*Associate Professor Immonen*

In spite of the fact that Associate Professor Immonen taught in the same Division as the plaintiff, was hired the same year as the plaintiff (1963), and had the same level of education as the plaintiff (MFA), he was consistently paid more than the plaintiff, again for no clearly established reasons. Based on the same analysis under 29 U.S.C. § 206(d)(1), *Corning Glass Works, supra,* and *Marshall v. Georgia Southwestern College, supra,* set forth above, the defendants failed to carry their burden of refuting the inference of sex discrimination against plaintiff for each of the following years' salary differentials: 1973–74, $1000; 1974–75, $800; 1975–76, $800; 1976–77, $800; 1977–78, $850; 1978–79, $950.

*Associate Professor Udvardy*

Associate Professor Udvardy was hired by RISD in 1973 after having taught at Brown University for several years. He was hired at the rank of associate professor in Freshman Foundation, and was also appointed at the same time to serve as Chairman of the Freshman Foundation. While this represents a difference in responsibility between him and the plaintiff, the record clearly shows that for the years 1973–74 through 1976–77, he received a separate and identifiable stipend for his Chairman's duties, above and beyond his faculty base salary. On this basis, therefore, this base salaries for those years, exclusive of the stipend, can be compared. For the years 1977–78 and 1978–79, when he did not serve in an administrative capacity, but continued as a Freshman Foundation Associate Professor, his total base salaries can be compared to the plaintiff's. In 1979–80, when he resumed the position of Freshman Foundation Chairman, his salary is not comparable, because no separate or additional compensation for this administrative capacity is identified. *Orahood, supra.*

As far as his qualifications and background are concerned, (in the context of 29 U.S.C. § 206(d)(1)(iv)), the record shows that he received his MFA from Yale in 1965. Defendant's exhibit E indicates comparable teaching experience and training to that of the plaintiff. (In discussing the separate question of Udvardy's 1973 appointment as Chairman of Freshman Foundation, the defendants admit that his qualifications are equivalent to the plaintiff's). In comparing their respective base salaries, and *not* considering Udvardy's separate stipends for his administrative capacities, it is clear that under the same analysis under 29 U.S.C. § 206(d)(1), *Corning Glass Works, supra,* and *Marshall v. Georgia Southwestern College, supra* set forth above, the defendants failed to carry their burden of refuting the inference of sex discrimination, after it was established that Udvardy's base salary was higher than the plaintiff's for equal work. This salary differential is broken down by years as follows: 1973–74, $2800; 1974–75, $3100; 1975–76, $3100; 1976–77, $3800; 1977–78, $4050; 1978–79, $3150.

*Professor Pappas*

In addition to serving RISD at a higher rank than the plaintiff, Professor Pappas had taught at RISD between eight and ten more years than the plaintiff. Otherwise, their education and backgrounds were comparable (*e.g.*, both had an MFA degree). No seniority *system*, the exception under § 206(d)(1)(i), was shown to be in effect at RISD. The exceptions under § 206(d)(i), (ii), (iii), and (iv) likewise do not apply. In spite of the temptation to attribute Pappas' salary differential to his prior service, the Court cannot do so on the evidence before it. The defendants had the burden, once the plaintiff established Pappas was paid more for doing an equal job, of showing that the factor of sex played no part of the basis for the wage differential. *See* 29 C.F.R. § 800.142. The defendants, having failed to meet their burden, discriminated against the plaintiff because of her sex vis a vis Pappas in the following annual amounts: 1973–74, $1400; 1974–75, $1500; 1975–76, $1600; 1976–77, $1600; and 1977–78, $1700.

*Professor Szosz*

During the academic years 1973–74 through 1976–77, Professor Szosz served RISD as Associate Dean and as Acting Provost. He did not, during those years, serve in an "equal job" to that held by the plaintiff. *Orahood, supra.* The only remaining years for comparison, *i.e.* when Szosz served strictly as a Professor in Freshman Foundation, are the years 1977–78 through 1979–80. During each of these three academic years, Szosz received a higher salary than did plaintiff for performing substantially equal work. The record shows that Szosz also holds an MFA and that he began teaching at RISD in 1960, three years before the plaintiff.

The defendants failed to carry their burden and did not show that the plaintiff's sex was not a factor in the Szosz-Melanson wage differential. This being the case, the defendants discriminated against the plaintiff under 29 U.S.C. § 206(d)(1) in setting the following years' wage differentials: 1977–78, $1800; 1978–79, $1950; 1979–80,

$486. *Corning Glass, supra; Marshall v. Georgia Southwestern College, supra.*

*Assistant Professor Powell*

Only in 1978–79 did Powell receive more pay than did the plaintiff. During 1977–78 and 1978–79, Powell was the Freshman Foundation Chairman. His 1978–79 base salary *includes* whatever compensation he received for his responsibilities as Division Chairman as the record does not indicate a separate stipend was paid. This being the case, no comparison can be made under the Equal Pay Act. *Orahood, supra.*

*Assistant Professor Massey*

The record reflects that in 1977–78, Massey received $150 more in salary than did the plaintiff. Likewise, in 1978–79, he received $100 more than did the plaintiff. Presumably RISD thought he was doing a substantially equal job to the plaintiff in spite of the lower rank he held. He is shown as *not* holding an MFA degree and he too began teaching at RISD in 1963. No explanation or exception under § 206(d)(1) was established to justify the differential in the face of an inference of sex discrimination. Again, the defendants violated the Equal Pay Act, this time with respect to the Massey-Melanson differential. *Corning Glass Works, supra.*

*Assistant Professor Keck*

Assistant Professor Keck received $50 more in salary than did the plaintiff in 1978–79. As with Massey, the defendants failed to carry their burden under § 206(d)(1) to establish that a reason other than sex accounted for the differential. Keck is shown to hold an MFA and began teaching at RISD in 1965. The defendants violated the Equal Pay Act in this regard. *Corning Glass Works, supra.*

*Damages*

■ To the extent the plaintiff has proved violations of the Equal Pay Act, she is entitled to damages. For the purpose of enforcing the Equal Pay Act, any amount owing to the plaintiff is treated as unpaid minimum wages or overtime compensation under 29 U.S.C. § 206(d)(3) which reads as follows:

(3) For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this Act [29 U.S.C.S. §§ 201–216, 217–219, 557].

*See Bullock v. Pizza Hut, Inc.*, 429 F.Supp. 424, 431 (M.D.La.1977). The methodology for recovering such "wages" or "compensation" is set forth in 29 U.S.C. § 216(b) as follows: "Any employer who violates the provisions of section 6 or section 7 [29 U.S.C. §§ 206 or 207] shall be liable to the employee ... affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages..." *See also Hodgson v. Miller Brewing Co.*, 457 F.2d 221, 227 (7th Cir. 1972). In addition to the availability of "wages" or "compensation" plus an equal amount of liquidated damages, 29 U.S.C. § 216(b) also provides for attorneys' fees and costs with the following language: "The court shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." *See also* 29 C.F.R. § 800.166 (1981).

Leaving aside for the moment the questions of liquidated damages, attorney's fees and costs, the "wages" or "compensation" owed the plaintiff must first be determined. Plaintiff argues that she should receive as back pay the difference between what the average male associate professor *at RISD* received and what she received. As indicated previously, the Court cannot do this absent a showing (found lacking in this case) that all RISD associate professors do "equal work" under the Equal Pay Act.

Nor does the Court believe that it should award damages to plaintiff based on the difference between her salary and the salary of the highest paid male who was performing equal work, in this case Udvardy. The record reveals that RISD's rather haphazard system of determining salary levels has produced a wide variation in salaries

even among male employees who are doing equal work. It would seem inappropriate to attribute the entire differential between plaintiff's and Udvardy's salary to sex discrimination when a portion of this differential is probably attributable to the random variations that pervade the RISD salary structure. The more appropriate measure of the amount of salary differential due to sex discrimination is the difference each year between plaintiff's base salary and the *average* base salary received by the males found to be performing equal work. Indeed, this was the method of calculating back pay employed by at least two courts in similar Equal Pay Act violation cases. *Bullock, supra*, at 431; *Pedreyra v. Cornell Prescription Pharmacies*, 465 F.Supp. 936, 949 (D.Colo.1979).

The calculation of back pay using this method is shown in the following table:

| Year | Average Salary of Males Doing Equal Work | Melanson Salary | Differential |
|---|---|---|---|
| 1973–74 | 14,512.50 | 13,200.00 | 1,312.50 |
| 1974–75 | 15,540.00 | 14,400.00 | 1,140.00 |
| 1975–76 | 16,660.00 | 15,500.00 | 1,160.00 |
| 1976–77 | 16,000.00 | 15,800.00 | 200.00 |
| 1977–78 * | 17,711.11 | 16,750.00 | 961.11 |
| 1978–79 | 18,571.43 | 17,650.00 | 921.43 |
| 1979–80 ** | 19,331.33 | 20,486.00 | -- |
| | | Total: | 5,695.04 |

* The Court has included Powell's salary in this calculation. The record reflects that Powell was doing work equal to that of Melanson, in addition to serving as Chairman of the Freshman Foundation, while receiving a smaller salary.

** Because plaintiff earned more in this year than the average salary of males doing equal work, no award will be made for this year.

Having determined the amount of unpaid "wages" or "compensation" owed to the plaintiff under 29 U.S.C. § 206(d), the next question to be addressed is that of liquidated damages provided for in 29 U.S.C. § 216(b). Any such award of liquidated damages is governed by the standards set forth in 29 U.S.C. § 260 as follows:

In any action commenced prior to or on or after the date of the enactment of this Act [May 14, 1947] to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the

Fair Labor Standards Act of 1938, as amended [29 U.S.C.S. §§ 201–216, 217–219, 557], if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended [29 U.S.C.S. §§ 201–216, 217–219, 557], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16 of such Act [29 U.S.C.S. § 216].

In essence, if the Court finds that the salary discrimination was not in good faith, or that RISD did not have reasonable grounds to believe that the salary differentials were not violations of the Equal Pay Act, the award of liquidated damages (*i.e.* an *additional* $5,695.04) is mandatory. *See* 29 C.F.R. § 790.22 (1981); *Laffey, supra,* at 464–65, and *Nitterright v. Clayton,* 454 F.Supp. 130, 140–41 (D.D.C.1978). Should the Court find that the defendants did act in good faith and had reasonable grounds to believe they were not violating the Equal Pay Act, the Court *still has* the discretion to award liquidated damages. *Id.; see also Hodgson v. Miller Brewing Co., supra,* at 227–28. The award of reasonable attorney's fees and costs to the plaintiff is mandatory under the Equal Pay Act. 29 U.S.C. § 216(b); *Nitterright, supra,* at 141.

Before this Court can exercise any discretion on the award of liquidated damages in this case, it must first determine whether the defendants have met the substantial burden of proving that their failure to comply with the Equal Pay Act was in good faith *and* that they had reasonable grounds for the belief that they were in compliance. 29 U.S.C. § 260 (emphasis added); *Laffey, supra,* at 464–65. If this very difficult standard of proof is not met, the Court must award the plaintiff liquidated damages. *Laffey, supra,* at 465; *Nitterright, supra,* at 140–41; *Pedreyra, supra,* at 950.

"Good faith" is an honest intention to ascertain what the Equal Pay Act requires and to act in accordance with it. *Laffey, supra* and *Nitterright, supra,* citing *Addison v. Huron Stevedoring Corp.,* 204 F.2d 88, 93 (2d Cir. 1953), *cert. denied,* 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed. 384. The defendants' activities in 1972–73 in appointing an Equal Employment Opportunity officer and developing an affirmative action plan are indicative of some effort on their part to ascertain the requirements of Title VII and, presumably, the Equal Pay Act. Assuming that these and possibly other activities did in fact reflect an honest intent *to ascertain* what the Equal Pay Act requires, the record of the defendants' salary action toward the plaintiff shows that they failed to develop an honest intention *to act* in accordance with the Act's mandate of equal pay for equal work. While the defendants might argue that the plaintiff often received annual pay raises that were higher *percentage-wise* than those received by some comparable male faculty members, this is not indicative of an honest effort to comply with the Act when, after the pay raises, the plaintiff consistently remained at a lower salary level. *See Hodgson v. American Bank of Commerce, supra,* at 421. The defendants have failed to carry their substantial burden of proving good faith toward the plaintiff. *Laffey, supra,* at 464–65; *Pedreyra, supra.*

Even if good faith were shown by the defendants' actions toward the plaintiff, they still had to show they had reasonable grounds for believing they were in compliance with the Act. *Nitterright, supra,* at 140. Ambiguous or complex legal requirements may provide reasonable grounds for an employer's good faith, but erroneous, belief that it is in conformity with the Act. *Laffey, supra,* at 466. Not only have the defendants failed to point to any particular ambiguous or complex provisions in the Act, they have presented little (if any) evidence tending to show they had reasonable grounds for a belief that they were not violating the Act vis a vis the plaintiff. After 1974, the defendants could not have reasonably believed that paying the males in the comparison group more than they paid the plaintiff—particularly those with

less experience and/or with a lower rank than the plaintiff had—was in compliance with the Act. Considering the relative sophistication of RISD when compared to some other employers, once it realized the applicability of the Equal Pay Act to its employees, it should have taken steps beyond appointing an Equal Employment Opportunity officer and developing an affirmative action plan to ensure compliance with the Act. In the absence of any proof of such steps (other than inadequate pay raises) in their dealings with the plaintiff, the defendants have failed to satisfy the Court that their failure to pay the plaintiff an equal salary to that paid men doing equal work was based upon a reasonable belief of compliance. *See Donahue v. George A. Fuller Co.*, 104 F.Supp. 145, 152 (D.R.I. 1952). The defendants do not fall within 29 U.S.C. § 260.

Since the Court has found that the defendants have shown neither good faith nor a reasonable basis for their action, it must award the plaintiff liquidated damages in an amount equal to the previously determined unpaid compensation, *i.e.* $5,695.04. 29 U.S.C. § 216(b); *Hodgson v. Miller Brewing Co., supra.*

An order will be prepared in keeping with this Opinion.