[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This matter is before the Court on plaintiff's amended complaint seeking declaratory relief pursuant to R.I.G.L. 1956 §9-30-1 (1985 Reenactment) and R.C.P. 57 and injunctive relief pursuant to R.C.P. 65. Plaintiff in this action is one of several interrelated business entities involved in a long term land development project in Coventry, Rhode Island. Following a two-day evidentiary hearing and a review of the entire record this Court finds the pertinent facts to be as follows.
I. BACKGROUND
The facts pertinent to this action span approximately twenty years. In the early 1970s Mapleroot Development Corporation (hereinafter "MDC") a Rhode Island Corporation, purchased an eighty-nine acre parcel of land in the Town of Coventry for development purposes. The envisioned project was a "Planned Unit Development" and was to include buildings of various uses to be combined as an integrated, cohesive whole. Although conceived ultimately to work together as a whole or "unit," the buildings were to be constructed not concurrently but in phases.
For financial and tax purposes many business entities were used in implementing each phase of the project. However, these various entities comprised the same individual persons and operated as coadunate components of the larger business enterprise. Woodland Manor III Associates, the plaintiff in this action, is a Rhode Island limited partnership to which MDC transferred land in completing the final phase of the long term multi-phase project.
Following the original purchase of the land, MDC needed to determine the amount and location of the buildable land as situated upon the eight-nine acre tract. In pursuit of this interest MDC sought to determine the jurisdiction of the Department of Natural Resources (now called the Department of Environmental Management; hereinafter simply "the Department") over the subject parcel. Such jurisdiction derived from the Freshwater Wetlands Act. Pursuant to this statutory scheme as codified in G.L. 1956 § 2-8-8 et seq., in June, 1974, a representative of the MDC filed a "Request for Freshwater Wetlands Applicability Determination" (hereinafter "Request").
At the evidentiary hearing Messrs. Giordano, a general partner in Woodland Manor III Associates, and Peter Janaros, the Supervisor of the Department's Wetlands Division, testified about the Wetlands regulatory process. As part of the preliminary determination the Department first conducts an on-site inspection of the land and "flags" or delineates the wetlands in accordance with applicable regulations. Robert Rocchio, a land surveyor for the developer, testified that Michael Pickering, a Department wetland biologist, went to the site and established the 247.5 contour as the limit of disturbance. The Department then determines whether the proposed development would impact the delineated wetlands such that a "Formal Application" is necessary.
Attached to the Request filed in accordance with this procedure was a site plan prepared by C.E. Maguire, the engineering firm engaged by the developer. In response to this Request the Department sent the developer a letter dated June 17, 1974 which stated in part that:
 Provided there is no construction or regrading below the 247.5 foot contour as shown on the above-referenced plan and that final grading and drainage plans and computations are submitted for review and approval of the Department prior to start of construction, it is our conclusion that the Fresh Water Wetlands Act does not, at this time, appear applicable to this proposal.
This language is central to the instant controversy.
Following this statement by the Department, the developer continued the process of presenting the project to the myriad state regulatory agencies whose permissions would eventually be needed in order for the project to reach completion as planned. This process had begun with the creation of a "bubble plan" which illustrated the general features of the entire project. This plan embodied the concept but not the details of the project and was used to assess the feasibility of the proposal. Following discussion, modification, and analysis of the "bubble plan" the developer created a "Master Plan." This plan contained a more detailed site plan of the "bubble plan" and served to provide a basis for coordination among the developer and all the state and local regularity agencies concerned.
One such area of concern was that of the sewage system. At the evidentiary hearing, Antone Giordano, on behalf of the developer, testified regarding the role of the then "Master Plan" in designing a sewage system to serve the project. Mr. Giordano stated that the magnitude of the project together with the localized high water table demanded the installation of a sewage system through the Town of Coventry to the project site. The "Master Plan" defined the scope and nature of the entire project so that the sewage needs could be computed and an appropriate design could be made. Indeed, a 3.5 mile sewer system was eventually sized, designed and installed at substantial expense for the multi-phase project.
In 1978 the developer was ready to begin construction of the first phase of the project, a nursing home entitled Woodland Manor I, and submitted a final grading and drainage plan to the Department pursuant to the 1974 letter. The Department responded to this submission in a letter dated June 29, 1978 which stated in pertinent part:
 Under the following provisions: adequate measures are taken to prevent sediments from entering adjacent wetlands . . . it is our conclusion that the fresh water act does not appear applicable to this proposal. (emphasis added).
Similarly, in 1980, the developer submitted a final drainage and grading plan for another phase of the project, a nursing home owned by Coventry Health Center Associates. The Department responded by stating:
 Under the following provisions, . . . adequate measures are taken to prevent sediments from entering adjacent wetlands . . . it is our conclusion that this proposal represents an insignificant alteration of a freshwater wetland. Therefore, under the aforementioned provisions, a permit to alter freshwater wetlands will not be required. (emphasis added).
The event precipitating the instant controversy over the scope and import of the 1974 letter occurred after the completion of all but the final phase of construction. In August, 1986, the Department responded to a submission by the plaintiff Woodland Manor Associates (WMA) seeking the approval of the final grading and drainage plan for the last phase of construction pursuant to the 1974 letter. The 1986 letter contained the following language:
 Proposed alteration, including filling, vegetative clearing, grading, building construction, tennis court and drainage installation will result in encroachment, significant loss, disturbance and alteration of the natural characteristics of a freshwater wetland, adversely impacting wildlife habitat value, recreational value, and groundwater recharge and quality. Be advised that the public value of the wetland, its outstanding wildlife habitat value and its location within one of this state's primary groundwater reservoirs, require that the wetland receive the highest level of protection. As proposed, this project has the highest probability of being denied by the department's Freshwater Wetlands Section.
The letter further stated that a formal wetland application would be required by law. The parties scheduled a series of meetings commencing in September, 1986 in an attempt to resolve this matter. These efforts failed and in May, 1989, plaintiff filed this action.
II. STATEMENT OF ISSUES
The plaintiff frames the issue before the Court as whether the June 17, 1974 letter permits construction up to the 247.5 foot contour line thereby estopping any Department action to the contrary. Plaintiff relies on a line of cases applying equitable estoppel against governmental agencies in support of its position. The Department frames the threshold issue as whether the plaintiff may bypass the administrative procedure established by statute to contest the 1986 decision to require a formal application. The Department then frames the more substantive issue as whether the same 1974 letter bars the Department from carrying out the statutory mandate of evaluating plans submitted by the plaintiff in 1986.
In respect to the threshold issue raised by the Department, our Supreme Court has stated on many occasions that "exhaustion of administrative remedies will not be required when those remedies are inadequate and may result in a futile exercise."Greenwich Bay Yacht Basin Association v. Brown, 537 A.2d 988, 993, (R.I. 1988)(citations omitted). By stating in the 1986 letter "this project has the highest probability of being denied by the Department's Freshwater Wetlands Section," the Department established the futility of pursuing administrative procedures to resolve the dispute. Accordingly, the exhaustion requirement does not bar this action. Moreover, our Supreme Court has noted that when prolonged administrative review creates a bureaucratic morass for applicants, judicial review is appropriate. SeeRatcliffe v. Coastal Resources Management Counsel,584 A.2d 1107 (R.I. 1991).
In reaching the more substantive issue raised in this matter this Court agrees with the plaintiff that the 1974 letter forms a representation critical to an equitable estoppel analysis.
III. EQUITABLE ESTOPPEL AGAINST GOVERNMENTAL AGENCIES
Our Supreme Court has long recognized that the doctrine of estoppel may in appropriate circumstances be invoked against a public body to prevent injustice where the agency or officers thereof, acting within their authority, made representations to cause the party seeking to invoke the doctrine either to act or refrain from acting in a particular manner to his or her detriment. Murphy v. Duffy, 46 R.I. 210, 124 A. 103
(1924)(taxpayer's suit to enjoin payment by town treasurer to contractor failed on ground that town was estopped to deny school committee's approval of work done where school committee was silent and had a duty to speak); Santos v. City Council,99 R.I. 439, 208 A.2d 387 (1965)(estoppel available against city council but not supported by facts of case); Ferrelli v.Department of Employment Security, 106 R.I. 588, 261 A.2d 906
(1970)(remanding cases for further consideration of the evidence on the issue of whether Department of Employment Security estopped from raising question of claimant's eligibility).
Our Supreme Court has most recently addressed the doctrine of equitable estoppel as applied against governmental agencies inGreenwich Bay Yacht Basin Association v. Brown, 537 A.2d 988
(R.I. 1988). In that case the Supreme Court noted the importance of holding an evidentiary hearing in order to apply the doctrine and remanded for the reason that no such hearing had been held. No such procedural defect occurred in this matter since this Court held an evidentiary hearing in which five different witnesses testified regarding how the 247.5 foot contour line had been established as well as how the overall project had been planned and implemented.
In Greenwich Bay the Court relied on a line of cases that had announced the rule that "building permits lawfully issued for a permitted use should be immune to impairment or revocation by reason of a subsequent amendment to the zoning evidence when the holders thereof, acting in reliance thereon, in good faith, initiate construction in some reasonably substantial measure or incur some reasonably substantial obligation promoting such construction." Shalvey v. Zoning Board of Review of the City ofWarwick, 210 A.2d 589, 593 (R.I. 1965). In applying this rule to a change in program criteria by the Coastal Resources Management Council the Court in Greenwich stated "it seems to us that the doctrine laid down in . . . Shalvey would be applicable to the instant case, even though we are dealing here with a change in program criteria as opposed to an amendment to a zoning ordinance." Greenwich Bay, 537 A.2d at 992. Similarly, this Court finds the doctrine applicable to the representation made by the Department in the 1974 letter.
As articulated, the above rule encompasses three elements: substantial performance undertaken; in reliance on the permit; in good faith. In formulating this rule the court in Shalvey was careful to point out the policy underlying it. The court wrote, "in our opinion the rule thus stated promotes justice by protecting the interests of a permittee who has acted under a permit in good faith but withholding protection from permits where good faith does not appear, and thus protects the public interest in an effective regulation of land uses." Shalvey, 210 A.2d at 593. This statement recognizes the tension between the public interest in land use regulation and an individual's interest in conducting affairs in reliance on the actions of governmental agencies.
In applying the above elements to this matter this Court relies substantially on the credible testimony of Antone Giordano, a general partner of the plaintiff partnership who testified for both sides at the hearing. This Court found Mr. Giordano's testimony consistent, forthcoming, and plausible. His testimony was corroborated by Robert Rocchio and Peter Janaros, the Department's wetlands supervisor from 1978-1987, who also testified on behalf of the plaintiff. The Department, on the other hand, put on Charles Horbert, a wetlands biologist, and Ray Larson, a professional engineer. These witnesses testified regarding technical aspects of delineating wetlands in an attempt to discount the 247.5 elevation as an immutable determination. This Court is unpersuaded by their testimony as it applies here to an estoppel theory.
With respect to the first element of substantial performance undertaken, this Court finds that the design and construction of the entire project was predicated on the developer being able to build up to the 247.5 foot elevation. The cost of the sewer system alone, just one aspect of the project designed to serve the entire development, constituted substantial performance. Accordingly, this first element is satisfied.
The second element of the estoppel doctrine requires reliance on a representation, here the 1974 letter. This Court is satisfied that such reliance occurred. This point is supported by observing the procedure the Department had followed when administering the earlier phases of the project.
The third element of good faith presents the most elusive requirement. Determining good faith turns largely on reasonableness and honesty. See, e.g., Goodman v. Turner,512 A.2d 861, 865 (R.I. 1986) ("[G]ood faith connotes something more than the affirmative absence of fraud. It presupposes areasonably diligent effort. . . .") (emphasis added); Melansonv. Rantoul, 536 F. Supp. 271 (D.R.I. 1982) ("Good faith is anhonest intention. . . .") (emphasis added). Under this element the Court will assess the reasonableness of the disparate interpretations placed upon the 1974 letter by the parties as well as the honesty of the party alleging estoppel.
The Department contends that the meaning of the 1974 letter is clear and unambiguous in that it states that future construction could proceed only upon the submission of final grading and drainage plans to the Department for approval. The Court finds this interpretation unreasonable in that it would render the contour line referenced in the 1974 letter a nullity. Were the Court to accept this interpretation the Department would be free to make demands upon the developer without regard to the 247.5 foot elevation that was established after careful procedures and stated plainly in the letter as a guideline for future action.
On the other hand the Court agrees with the plaintiff's interpretation of the letter as establishing the limit of disturbance to the contours line thereby delimiting the jurisdiction of the Department. The testimony elicited at the hearing, by supplying the context of the letter, persuaded the Court that the Department was aware of the scale of the project at the time the letter was written and knew or should have known that the developer would rely, and would be reasonable in relying, on the critical elevation as applied to the entire project. This testimony also revealed, in this Court's opinion, the honest intentions of the developer.
Accordingly, this Court is satisfied that the Department should be equitably estopped from requiring a formal wetlands application on the basis of any disturbance above the 247.5 foot elevation that does not adversely impact areas below the elevation and otherwise within the Department's jurisdiction. This concern for adjacent wetlands was made apparent to the developer throughout the phases in above referenced letters dated June 29, 1978; January 15, 1980; and January 19, 1981. In light of this notice it would be unreasonable for the plaintiff to insist that the 1974 letter would allow any disturbance whatsoever occurring above the 247.5 foot elevation.
 IV. CONCLUSION
In so holding the Court is mindful of the delicate balance of competing interests weighed in this opinion. This case presents a highly unusual set of circumstances that warrant such a remedy and in no way should be construed as undermining the strong public policy interest in land use regulation. The very long duration and complexity of the project and the intervening increased stringency of environmental regulations generally, the substantial expenses incurred by the developer in the early stages of the project and the good faith of the plaintiff as evidenced by the testimony of the several witnesses militate in favor of estoppel.
Counsel shall prepare an appropriate judgment for entry.